564 F.2d 292
 Geoffrey Raymond Peter Norman VALENTINE, Plaintiff-Appellee,
v.
AETNA INSURANCE COMPANY, Defendant-Appellant.
Geoffrey Raymond Peter Norman VALENTINE, Plaintiff-Appellee,
v.
CONTINENTAL CASUALTY COMPANY, Defendant-Appellant.
Geoffrey Raymond Peter Norman VALENTINE, Plaintiff-Appellee,
v.
ROYAL GLOBE INSURANCE COMPANY, Defendant-Appellant.
 Nos. 75-1721, 75-1734 and 75-2152.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 7, 1977.
 
 1
 David Gordon (argued), of Bronson, Bronson & McKinnon, Peter W. Fisher (argued), of Maloney, Chase, Fisher & Hurst, San Francisco, Cal., Robert Lee (argued), of Rust & Armenis, Sacramento, Cal., for defendants-appellants.
 
 
 2
 Harlow P. Rothert (argued), of Hancock, Rothert & Bunshoft, San Francisco, Cal., for plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the Northern District of California.
 
 
 4
 Before BROWNING and TRASK, Circuit Judges, and PREGERSON, District Judge.*
 
 PREGERSON, District Judge:
 
 5
 These consolidated appeals are from a judgment apportioning responsibility among four insurance companies for the payment of a personal injury judgment.
 
 
 6
 Bay Area Contractors, Inc. (Bay), a general contractor on an apartment project, entered into a subcontract with Atlas Heating and Ventilating Company (Atlas) for the installation of heating equipment. The subcontract contained broad language requiring Atlas to procure liability insurance coverage "of not less than $300,000/$500,000.00 per occurrence" to protect Bay "against liability for damages because of injuries . . . suffered by persons . . .." Atlas then had Bay named as an additional insured in an endorsement on Atlas' $100,000 policy with Aetna Insurance Company (Aetna). The Aetna endorsement made Bay an additional insured "only as respects their interest as they may appear in work being performed for them by" Atlas, and stated that Aetna's policy "shall be primary . . . and any insurance carried by . . . additional insureds shall be excess coverage and in no sense contributory." Atlas also had an umbrella excess coverage policy with Continental Casualty Company (Continental) providing "following" coverage, i. e., matching coverage under the Aetna policy, for amounts over $100,000 and up to $2,000,000.
 
 
 7
 Bay's own insurance consisted of a $200,000 policy with Royal Globe Insurance Company (Royal) and an excess coverage policy subscribed to by certain underwriters at Lloyds, London and certain British insurance companies (collectively referred to as Lloyds), represented by Geoffrey Raymond Peter Norman Valentine, plaintiff below, for amounts over $200,000 and up to $2,000,000.
 
 
 8
 Robert Cattuzzo, an employee of Atlas, fell off a temporary ramp installed by Bay and sustained severe injuries. Cattuzzo brought suit in state court against Bay. Aetna and Continental denied coverage, and so Royal undertook the defense.
 
 
 9
 Cattuzzo was awarded a $700,000 verdict, of which workmen's compensation paid $18,848.60. The remaining $681,151.40 was paid as follows:$200,000 Royal
 
 
 10
 $ 50,000 Aetna
 
 
 11
 $431,151 Lloyds
 
 
 12
 Lloyds, which paid most of the judgment, brought suit in the District Court seeking reapportionment of the insurance companies' payment responsibilities and also damages from Royal for a bad faith refusal to settle the action for $500,000 before verdict.
 
 
 13
 Applying California case law, the District Court found that Aetna's policy provided primary coverage for the Cattuzzo accident, that the Royal policy provided the second layer of coverage, and that Lloyds and Continental provided the third layer of coverage requiring them to contribute to the judgment pro rata:
 
 
 14
 $190,575.70 Lloyds
 
 
 15
 $190,575.70 Continental
 
 
 16
 $200,000.00 Royal
 
 
 17
 $100,000.00 Aetna
 
 
 18
 On Lloyds' claim for damages against Royal, the District Court found that Royal had breached its duty to negotiate a settlement in good faith and that, had Royal not frustrated settlement efforts, the Cattuzzo case could have been reasonably settled for $500,000. The District Court then held Royal responsible to Lloyds and Continental for the difference between the $500,000 probable settlement figure and the $681,151.40 paid by the insurers. That made the final apportionment as follows:
 
 
 19
 $100,000.00 Aetna
 
 
 20
 $381,151.40 Royal
 
 
 21
 $100,000.00 Continental
 
 
 22
 $100,000.00 Lloyds
 
 
 23
 Royal, Aetna, and Continental appeal. The appeals raise the following contentions:
 
 
 24
 (1) That an overlooked indemnification provision in the subcontract between Bay and Atlas should be enforced so that the Aetna and Continental policies would be primary to the Royal and Lloyds policies;
 
 
 25
 (2) That the District Court erred in interpreting the subcontract and the Aetna policy endorsement to provide coverage under the Aetna policy for accidents relating to work done by Bay;
 
 
 26
 (3) That the trial court erred in fixing Continental's coverage above $200,000;
 
 
 27
 (4) That the doctrine of equitable subrogation does not apply between primary and excess insurers so that Lloyds and Continental are not entitled to damages from Royal;
 
 
 28
 (5) That there is insufficient evidence to support the finding that the Cattuzzo litigation could have been settled for $500,000.
 
 
 29
 (1) THE INDEMNIFICATION AGREEMENT
 
 
 30
 Royal argues that the subcontract between Bay and Atlas contains an indemnification agreement which would, if enforced, mean that Atlas' insurance should be exhausted before resort to Bay's. We agree with Aetna that the indemnity provisions are not properly before this court. The trial court declined to rule on the validity and applicability of the indemnification clause in the subcontract on the ground that the issue had not been framed in the pre-trial pleadings, i. e. the theory was not raised in Royal's answers to the complaint and cross-complaint nor in its pre-trial statement. The District Court acted within its discretion in refusing to consider the indemnification theory because it was not timely presented.
 
 
 31
 (2) COVERAGE UNDER THE AETNA POLICY
 
 
 32
 Aetna and Continental argue that the District Court erred in determining that the Aetna policy provided primary coverage for the Cattuzzo accident. Continental argues that the insurance procurement provisions of the subcontract either mean that Atlas agreed to buy insurance generally covering all of Bay's liability for negligence, which is nonsensical, or that Atlas only agreed to provide insurance to protect Bay from the consequences of Atlas' negligence. We agree with the District Court that while it would be unreasonable to assume that a subcontractor would agree to procure liability insurance for all of the general contractor's operations, it is reasonable to conclude that a general contractor might desire to contract for a subcontractor's services "free of any liability to (the subcontractor's) employees." Judge Conti's Memorandum Decision, Clerk's Transcript on appeal, Vol. III, at 533.
 
 
 33
 Aetna and Continental may be correct that the parties' intent may narrow an otherwise broader literal coverage, see Dart Transportation Service v. Mack Trucks, Inc., 9 Cal.App.3d 837, 88 Cal.Rptr. 670 (1970), but no extrinsic evidence of the parties' intent was introduced in the case at bar.
 
 
 34
 Aetna's reliance on International Business Machines Corp. v. Truck Ins. Exch., 2 Cal.3d 1026, 89 Cal.Rptr. 615, 474 P.2d 431 (1970), is similarly misplaced. In I.B.M. the court, dealing with a question of statutory interpretation rather than private contractual language, refused to extend the concept of a "user" of a truck to include a shipper whose negligence caused an accident while furniture was being moved on a dock preparatory to loading it on a truck. In the instant case, the District Court's interpretation of the pertinent contractual language is not "an exercise in 'mental gymnastics' . . . far removed from the ordinary meaning of the concept(s)" under consideration, I.B.M., supra, 2 Cal.3d at 1030, 89 Cal.Rptr. at 618, 474 P.2d at 434, but is, on the contrary, the most reasonable interpretation of the parties' intent as expressed in the insurance procurement provisions of the subcontract and the Aetna policy endorsement. While in a closer case the court might favor application of I.B.M.'s policy that, as a general rule, liability should follow negligence, in the instant case, we agree with the District Court that Bay and Atlas intended Atlas' insurers to cover Bay's liability for negligence in causing injuries to Atlas' employees performing work on the apartment project.
 
 
 35
 (3) CONTINENTAL'S COVERAGE LIMIT
 
 
 36
 Continental argues that even if the Aetna and Continental policies provide coverage for the Cattuzzo accident, that coverage should be limited to a total of $300,000 because Atlas agreed to procure "not less than" $300,000 coverage. The District Court properly found that the subcontract language does not support a restriction on the terms of Continental's policy because the subcontract only sets a floor, not a ceiling, for coverage.
 
 
 37
 (4) EQUITABLE SUBROGATION
 
 
 38
 Under California law an excess carrier is not obligated to contribute to a settlement until the limit of the primary carrier's coverage has been exhausted, see Hellman v. Great American Ins. Co., 66 Cal.App.3d 298, 136 Cal.Rptr. 24 (1977) and cases cited therein at 66 Cal.App.3d 305, 136 Cal.Rptr. 28. The District Court found that Royal, who undertook the defense of the Cattuzzo litigation, refused in bad faith to contribute its policy limits, thereby frustrating settlement. The court further found that Royal could have settled the action for $500,000, i. e., $200,000 less than the $700,000 jury verdict and that Lloyds and Continental are entitled to that difference as damages for Royal's breach of its duty to its insured to negotiate and settle in good faith a duty enforceable by the excess carriers under the principle of equitable subrogation.
 
 
 39
 Although no California state courts have dealt specifically with an excess insurer's bad faith claim against a primary insurer, there are California cases allowing insurers to bring other causes of action against other insurers under the principle of equitable subrogation. Continental Cas. Co. v. Zurich Ins. Co., 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (1961); Continental Cas. Co. v. Phoenix Constr. Co., 46 Cal.2d 423, 296 P.2d 801 (1956). The only case interpreting California law on this particular cause of action ruled in favor of equitable subrogation. Peter v. Travelers Insurance, 375 F.Supp. 1347 (C.D.Cal.1974).
 
 
 40
 The California cases cited by Royal for the proposition that the insured must suffer a loss before equitable subrogation can be invoked are inapposite. Cases such as Patent Scaffolding Co. v. William Simpson Constr. Co., 256 Cal.App.2d 506, 64 Cal.Rptr. 187 (1967) and Mid-Century Ins. Co. v. Hutsel, 10 Cal.App.3d 1065, 89 Cal.Rptr. 421 (1970), stand for the general proposition that when a loss cannot be causally related to some alleged breach of duty on the part of the defendant, then neither a plaintiff, nor his insurer through equitable subrogation, can have a cause of action against the defendant. In the instant case there is no such proximate causation problem; the District Court found that if Royal had not frustrated settlement efforts, the amount of Lloyds' and Continental's loss would have been approximately $200,000 less.
 
 
 41
 Finally Royal urges that public policy argues against allowing equitable subrogation by an excess insurer to a bad faith claim against a primary insurer because excess insurers would be encouraged to indiscriminately threaten primary insurers with bad faith claims. This practice, urges Royal, would only result in higher settlements and insurance costs and increased litigation. We are persuaded that both common sense and public policy considerations support the allowance of equitable subrogation rights in the instant case, and that, contrary to Royal's arguments, the unavailability of equitable subrogation rights would lead to, not avoid, Royal's feared consequences of increased insurance and litigation costs.
 
 
 42
 The position of an excess insurer vis-a-vis a primary insurer corresponds to that of the insured to the insurer when only one insurance policy exists. As stated succinctly by the Minnesota Supreme Court,
 
 
 43
 When there is no excess insurer, the insured becomes his own excess insurer, and his single primary insurer owes him a duty of good faith in protecting him from an excess judgment and personal liability. If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured in that position.
 
 
 44
 Continental Casualty Co. v. Reserve Ins. Co., 238 N.W.2d 862, 864 (Minn.1976). The Minnesota Supreme Court's common sense conclusion is supported by many commentators in the insurance field. Bloom, Recovery against Primary Insurer by Excess Carrier for Bad Faith or Negligent Failure to Settle, 36 Ins. Counsel J. 235; Knepper, Relationships between Primary and Excess Carriers in Cases Where Judgment or Settlement Will Exhaust the Primary Coverage, 20 Ins. Counsel J. 207; R. Keeton, Insurance Law, § 7.8(d). Furthermore, policy considerations pertinent to both the courts and the insurance industry favor allowing an excess insurer to enforce a primary insurer's duties to the insured. As the Court reasoned in Continental Casualty Co. v. Reserve Ins. Co., supra,
 
 
 45
 First, when a primary insurer breaches its good-faith duty to settle within policy limits, it imperils the public and judicial interests in fair and reasonable settlement of lawsuits. If the excess insurer elects to settle in spite of the primary insurer's bad-faith objection, as is alleged in this case, the excess insurer risks losing the policy-limit contributions of the primary insurer and being forced to pay the entire settlement itself, even though the settlement may have been in the overall best interests of the insured. In such a case, the incentives are against settlement.
 
 
 46
 Second, a contrary result in this case would permit an unfair distribution of losses among insurers. The insured has paid for two distinct types of coverage, undoubtedly at different rates because they involve different amounts and kinds of risk. . . . When a primary insurer refuses in bad faith to settle, it forces the excess insurer . . . to cover both primary and excess liability. Thus, the purposes of the different kinds of coverage and their rating structures are thwarted as the excess insurer bears the full loss and fulfills the primary insurer's duty to the insured as well as its own.
 
 
 47
 238 N.W.2d at 864. Royal complains that application of equitable subrogation to this case only encourages excess insurers, such as Continental, to reject participation in settlement efforts hoping to obtain a no-liability verdict, or, if a liability verdict is entered, a bad faith damage judgment against the primary insurer. But Royal fails to consider that the opportunity for such behavior on the part of the excess carrier can only exist when the primary carrier has unreasonably refused to pay its policy limits. Thus an excess insurer's cause of action against a primary insurer only arises when the primary insurer by unreasonably refusing to pay policy limits breaches its duty to negotiate a settlement in good faith. As Judge Kelleher noted in Peter v. Travelers Insurance, supra, 375 F.Supp. at 1350:
 
 
 48
 That an excess insurer may recover from the primary for a breach of duty does not increase the duty or the liability of the primary. Under the doctrine of equitable subrogation, the duty owed an excess insurer is identical to that owed the insured. The excess will not be able to force the primary into accepting any settlement which his duty to the insured would not require accepting. . . . In considering whether it will settle a claim, the primary insurer may consider its own interests, but it must equally consider the interests of the insured, which become the interests of the excess insurer by subrogation.
 
 
 49
 In short, if the existence of excess insurance relieved a primary insurer of its responsibility to negotiate and settle up to its policy limits in good faith, then the primary insurer would have a disincentive to settlement. Moreover, if during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary's insurance exposure, the coverages and rate structures of the two different types of insurance primary and excess would be distorted, and excess insurance premiums would have to be adjusted. On the other hand, allowing an excess insurer to enforce a primary carrier's duty to negotiate and settle in good faith to the full limits of the primary carrier's policy does not add to or change that carrier's duties.
 
 
 50
 (5) INSUFFICIENT EVIDENCE OF DAMAGES
 
 
 51
 Royal contends that there is insufficient evidence to support the District Court's finding that the Cattuzzo litigation could have been settled for $500,000. Direct evidence of what would have occurred had the case not gone to a jury verdict is, of course, unavailable, and Royal must bear in mind that its breach of duty had caused this uncertainty.
 
 
 52
 The last demand from Cattuzzo before negotiations broke off was $750,000, and the circumstances indicated that Cattuzzo would have been willing to take less. Evidence established that the state trial judge expressed his opinion that $500,000 was a reasonable figure, and that Cattuzzo's attorney would have advised his client to give it serious consideration. We find that the District Court's arrival at $500,000 as a reasonable settlement figure is not clearly erroneous.
 
 
 53
 AFFIRMED.
 
 
 
 *
 Honorable Harry Pregerson, United States District Judge, Central District of California, sitting by designation