**MISSION INSURANCE COMPANY**

v.

**AETNA LIFE AND CASUALTY COMPANY.**

Civ. A. No. 85–4899.

United States District Court, E.D. Louisiana.

May 10, 1988.

Gus A. Fritchie, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for Mission Ins. Co.

Lawrence J. Duplass, Johnson & Duplass, New Orleans, La., for Aetna Life and Cas. Co.

## MEMORANDUM OPINION

MENTZ, District Judge.

This suit involves a claim by an excess insurer, Mission Insurance Company (Mission), against a primary insurer, Aetna Life and Casualty Company (Aetna), for sums that Mission paid to Joyce Fernandez, a plaintiff in a personal injury action tried in Civil District Court for the Parish of Orleans, State of Louisiana. Mission alleges that Aetna arbitrarily, negligently, and in bad faith failed to evaluate, negotiate, and settle Fernandez's claim within its primary policy limits thereby exposing Mission to excess liability.

The Mission suit was tried to the Court and the parties submitted post-trial briefs. Considering the briefs, the evidence, and the applicable law, the Court makes the following findings of fact and conclusions of law. To the extent that any of the factual finding constitute legal conclusions, they are adopted as such; to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

1. Joyce Fernandez filed suit in Civil District Court for the Parish of Orleans, State of Louisiana, seeking damages for personal injuries sustained on April 27, 1981 when a vehicle owned by All–Vend, Inc. and operated by its employee, Nathan Winston, struck Fernandez, a pedestrian, after having been involved in a collision with another vehicle driven by Charles Houpy.

2. Fernandez filed suit against Aetna and its insureds, All–Vend, Inc. and its driver, Nathan Winston, and State Farm Mutual Automobile Company and its insured, Charles Houpy. She alleged disability as a result of her accident and claimed $30,000 past and future medical expenses, $140,000 past and future loss of wages, plus pain, suffering and disability.

3. Fernandez named Mission as a direct defendant on May 20, 1985, approximately two weeks before commencement of trial. Rather than agree to a continuance of the trial, Fernandez agreed to dismiss Mission in exchange for Mission agreeing not to participate at trial.

4. There is no question that all parties had competent counsel in the Fernandez proceedings. Darlene Jacobs represented Fernandez; Vincent Paciera of the Lemle, Kelleher law firm represented Aetna, All-Vend, Inc., and Winston; Owen Neff represented State Farm and Houpy; Wood Brown of the Montgomery, Barnett law firm represented Mission.

5. Trial in the Fernandez suit commenced on June 3, 1985. The jury returned a verdict in favor of Fernandez and against Winston, All-Vend, Inc., and Aetna in the amount of $864,500.

6. Aetna provided a primary liability insurance policy to All-Vend, Inc. and Winston, in the sum of $500,000. Mission provided a liability policy to the same insureds in the sum of $2,000,000, excess of the Aetna policy. As a result of the judgment in favor of Fernandez, Aetna and Mission paid Fernandez $1,186,775.88 [1], of which Aetna paid $630,280.53 and Mission paid $556,495.35.

7. After the accident, Fernandez was examined by several physicians, who made written reports reflecting their opinions as follows:

May 1, 1981 Dr. David Jarrott, a neurosurgeon, diagnosed a cervical lumbar spine sprain.

May 12, 1981 Dr. J.E. Lindner, a general practitioner, diagnosed a "cervico-lumbo-thoracico" sprain and cerebral concussion. He recommended conservative treatment.

October 28, 1981 Dr. Jarrott found Fernandez's cervical symptoms "virtually resolved", but that she had persistent low back symptoms, with a 5% disability. He had no neurological objections to her returning to work.

February 17, 1982 Dr. Gordon Nutik, an orthopaedic surgeon, found no functional impairment of the low back and no nerve root irritation. Her x-rays were negative. Dr. Nutik was unable to explain Fernandez's low back symptoms and diagnosed a soft tissue injury of the low back.

April, 1982 Dr. K.E. Vogel ordered a CT scan of the lumbar spine which showed moderate disc bulging and unusually thick ligamentum flavum at the $L_{4-5}$ level, the combination of which may narrow the spinal canal. A discogram was essentially normal. Dr. Vogel performed a lumbar neurotomy, which is a non-surgical procedure to relieve pain.

July 28, 1982 Dr. Vogel rated Fernandez with a temporary 10–15% medical impairment of the body as a whole and restricted her from activities requiring her to lift, push, or pull more than 35 pounds or bend repeatedly.

July 25, 1983 Dr. Essam Elmorshidy, an orthopaedic surgeon, performed exploratory lumbar surgery at the $L_{4-5}$ and $L_5$–$S_1$ levels. He found thickening of the ligamentum flavum, which can be caused by either a congenital defect, degenerative arthritis, or trauma, but found no herniated or ruptured discs and no neurological defects. He partially removed the ligamentum flavum and performed a foraminectomy of the neural canal.

October 16, 1984 Dr. Elmorshidy discharged Fernandez when she elected not to have excision of the $L_{3-4}$ and $L_{4-5}$ discs, or a chymopapain injection, which he had recommended based upon positive test results and her continued complaints of pain. Dr. Elmorshidy diagnosed lumbar disc disease at the $L_{3-4}$ and $L_{4-5}$ levels.

March 15, 1985 Dr. R.C. Llewellyn, a neurosurgeon, recommended that Fernandez be hospitalized for testing.

April 2, 1985 Dr. Llewellyn performed a double level discectomy at the same

---

1. The sum of $1,186,775.88 represented a negotiated settlement of the judgment and included judicial interest and costs in the amount of $347,275.88.

point in Fernandez' back that Dr. Elmorshidy had performed exploratory surgery and found nothing of significance, and where Dr. Vogel had performed a neurotomy.

8. It is Aetna's practice to have their claims department evaluate and set the settlement value of each case, after consultation with the trial attorney. In June 1983, two years prior to the surgery performed by Dr. Llewellyn, Aetna reserved Fernandez's claim at $180,000. A reserve is the settlement value the insurance personnel place on a case. Although Fernandez's claim was reserved at $180,000, Aetna's claims manager, James Chett, had authority to settle the case up to the policy limits without changing the reserve. At all times, Chett was fully apprised of the status of Fernandez's case.

9. Prior to trial, Aetna had paid $54,782 on various claims unrelated to Fernandez's, but which arose out of the accident, leaving a balance of $445,218 available to settle Fernandez's suit.

10. By letter dated November 16, 1984, counsel for Fernandez, Darlene Jacobs, demanded $450,000 in settlement. This demand was made after Dr. Elmorshidy's exploratory surgery but before Dr. Llewellyn's double level discectomy. At that time, Aetna's remaining limit was $445,218, so that Jacobs' demand for $450,000 was not a settlement offer within the policy limits.

11. Likewise, Jacobs' increased demand for $475,000, which she made after Dr. Llewellyn's double level discectomy and immediately prior to trial, was not a settlement offer within the policy limits.

12. By letter dated May 31, 1985, Mission's counsel informed Aetna's counsel that Fernandez had agreed to non-suit Mission in the event the case would be tried. He stated that "on quantum, I consider this a most dangerous case", and further that

"I understand that the case can be settled at this time for an amount within the limits provided by your insurance company client, Aetna—we suggest that prudent claims handling practices demand such a settlement."

13. There is no evidence to suggest that Jacobs knew her settlement offers were in excess of Aetna's policy limits or that she was aware of the previous payments in the sum of $54,782.00 [2]. At no time did Jacobs make an offer to settle which was within Aetna's policy limits.

14. Judge Ortigue of the Orleans Parish District Court, who presided over the Fernandez case, recommended that the parties settle for $350,000. Jacobs never lowered her offer of $475,000 and Aetna never raised its offer of $180,000.

15. Jacobs testified in the case at bar that due to her own personal and professional conflicts, she was interested in settling Fernandez's suit. However, she admitted that she is not a good negotiator, preferring to rely instead on her well-recognized and respected courtroom skills. Other witnesses corroborated Jacobs' formidable courtroom skills and her tendency to stick to her original settlement offer, rather than to negotiate.

16. James Chett, Aetna's claims manager, testified in the case at bar that he would have authorized Paciera to offer as high as $350,000, if Jacobs had moved off of $475,000.

17. Joseph Ward, Mission's expert in the case at bar, testified that Aetna should have offered $350,000. However, he believed that Aetna's liability to Mission rests not so much in failing to offer a particular settlement figure, but in failing to negotiate with Jacobs. Ward testified that Aetna should not necessarily have offered its policy limits in settlement.

18. John Combe, Aetna's expert in the case at bar, testified that he would have

2. After counsel concluded their questioning of Jacobs, Mission requested permission to call Jacobs back to the witness stand in order to elicit testimony that she had no knowledge of any sums being paid out on the Aetna policy prior to the Fernandez trial. The Court denied

Mission's request, but allowed it to propound interrogatories to Jacobs and proffer her answers subsequent to the close of evidence. Mission's proffer shows that Jacobs had no knowledge that any sums had been paid out on the Aetna policy prior to trial.

placed a $250,000 settlement value on the case, but that Aetna's figure of $180,000 was not unreasonable considering the evidence tending to refute medical causation.

## CONCLUSIONS OF LAW

1. Jurisdiction is established under 28 U.S.C. § 1332 as Mission and Aetna are citizens of different states. The amount in controversy is $556,495.35, exclusive of interest and costs.

2. The duty of an insurer to its insured has been described as follows:

> [A]n insurer is not required to settle a claim within policy limits under penalty of absolute liability for any excess judgment rendered against the *insured.* Nevertheless, an insurer may be liable for an excess judgment against *its insured* where the insurer's refusal to settle within the policy limits is found to be arbitrary or in bad faith.

*Southern American Insurance Company v. Hartford Accident & Indemnity Company,* 498 So.2d 280, 282 (La.App. 1st Cir. 1986) (quoting *Cousins v. State Farm Mutual Automobile Insurance Company,* 294 So.2d 272, 275 (La.App. 1st Cir.), *writ refused,* 296 So.2d 837 (La.1974) (emphasis added)), *writ denied,* 500 So.2d 425 (La. 1987). Something more than mere error of judgment is necessary to constitute bad faith on the part of the insurer. *Younger v. Lumbermens Mutual Casualty Company,* 174 So.2d 672, 678 (La.App. 3d Cir. 1965).

3. This Court has held, in the context of a marine insurance policy, that a primary insurer owes a settlement duty to the excess insurer by analogy to the relationship between an insurer and its insured. *See Utica Mutual Insurance Company v. Coastal Marine, Inc.,* 578 F.Supp. 1376 (E.D.La.1984).

> If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured

in that position.... The position of an excess insurer vis-a-vis a primary insurer corresponds to that of the insured to the insurer when only one insurance policy exists.

*Id.* at 1378 (quoting *Valentine v. Aetna Insurance Company,* 564 F.2d 292, 297 (9th Cir.1977).) [3]

4. Judge Schwartz of this district has held in a Louisiana diversity case that a primary insurer owes a duty to the excess insurer "to act reasonably and in good faith, just as if there were no excess insurer." *Insurance Company of North American v. Home Insurance Company,* 644 F.Supp. 359, 363 (E.D.La.1986). *See also Bohn v. Sentry Insurance Company,* 681 F.Supp. 357 (E.D.La.1988) (where Judge Mitchell followed Judge Schwartz' opinion in *Home Insurance* ).

5. In *Southern American,* 498 So.2d at 282, the court recognized that the issue of "whether the primary insurer owes any settlement duty to an excess insurer, has not been directly addressed by the courts of [Louisiana]." The court declined to reach that issue because, even assuming such a duty, the facts would not support a finding that the primary insurer acted arbitrarily or in bad faith. Importantly for the purposes of the case at bar, however, the court in *Southern American* cited with favor this Court's ruling in *Utica* and the Ninth Circuit's ruling in *Valentine:* "We find persuasive the holdings of two federal cases that the primary insurer owes a duty to the excess carrier." *Id.* The court noted that there is a single treatise which disagrees with such a duty, 15 W. McKenzie & H.A. Johnson, *Louisiana Civil Law Treatise: Insurance Law and Practice,* § 221, at 405–407 (1986). *Id.*

6. In the recent case of *Commercial Union Insurance Company v. Mission Insurance Company,* 835 F.2d 587 (5th Cir. 1988), the Fifth Circuit noted that, although the trial court found that Louisiana law would permit an excess insurer to

---

**3.** The Court notes that *Utica* is distinguishable from the facts in the case at bar, insofar as the excess insurer in *Utica* was misled and there was a failure to communicate a $125,000 settlement recommendation before trial and a $145,-000 settlement offer after trial.

maintain an action against the primary insurer, Louisiana law on this issue is not settled. The Fifth Circuit then stated that it would "assume, without deciding, that such a cause of action exists in order to speed this case to its conclusion." *Id.* at 588 n. 1.

7. Similarly, for purposes of expediency and in consideration of the foregoing authorities which weigh in favor of finding a settlement duty in the context of this case, this Court assumes that under Louisiana law a primary insurer owes a settlement duty to the excess insurer. Accordingly, this Court declines to follow *Pacific Employers Insurance Company v. United General Insurance Company*, 664 F.Supp. 1022 (W.D.La.1987), which held that the primary insurer does not owe a settlement duty to the excess insurer.

8. As the Fifth Circuit found in *Commercial Union*, 835 F.2d at 588, "Louisiana law only imposes liability for an excess judgment against a primary insurer if that insurer failed to accept an actual offer to settle within its policy limits and such failure was negligent, arbitrary and/or in bad faith."

9. In the case at bar, Aetna never received an offer to settle which was within the existing limits of Aetna's primary policy. After deducting the $54,782 which had been paid out on other claims connected with the same accident, both of Jacobs' offers to settle, initially for $450,000 and later for $475,000, were in excess of $445,218, the existing limit on Aetna's policy. Therefore, Aetna is not liable for failure to settle within its policy limits. *Id.*

10. Assuming, arguendo, that Aetna did receive an offer to settle which was within its policy limits, the facts and circumstances of this case do not support a finding that Aetna acted negligently, arbitrarily, or in bad faith. Although there was no serious question that Aetna was liable for the accident, Aetna's offer of $180,000 was reasonably based on various relevant factors including: strong evidence on lack of medical causation; the lack of objective evidence of significant injury until almost four years after the accident when Dr. Llewellyn performed a double discectomy; questions of doctor shopping and symptom shifting; and Fernandez's return to part-time work.

11. There is no allegation or evidence that Aetna inadequately investigated Fernandez's claim.

12. With regard to the attacks on Aetna's trial strategy, which the Court is not certain are even relevant to the issue of whether they breached a settlement duty to Mission, the Court finds that Aetna acted reasonably in not deposing Dr. Llewellyn because Aetna had access to all of Dr. Llewellyn's records. Nor did Aetna need to call its own medical expert in view of the numerous negative medical reports from Fernandez's own treating physicians. Aetna was also justified in cross-examining Fernandez's economist instead of calling its own economist. This was a successful tactic as Aetna's trial counsel was able to get Fernandez's economist to reduce his $140,000 estimate of past and future loss of wages to $80,000.

13. There is no evidence or testimony that any of the parties believed Fernandez's claim had a value in excess of Aetna's policy limits.

14. Mission's own actions during the Fernandez proceedings belie its current argument that this was an excess case which Aetna should have attempted to settle within its policy limits. Mission had access to Aetna's files and an opportunity to monitor the case development. Although Mission wrote Aetna just before trial that the Fernandez suit was a "dangerous case", the fact that Mission agreed to be dismissed without prejudice and did not participate in the June 1985 trial, is inconsistent with a belief that Mission had excess exposure.

15. There is no evidence that, even if Aetna had raised its offer to $350,000, the case could have been settled. Jacobs informed Fernandez of the Judge's suggested figure of $350,000. There is no evidence as to how Fernandez responded to the Court's figure, except for the fact that Jacobs did not subsequently reduce her set-

tlement offer. Further, Jacobs testified that if Aetna had offered her $350,000, she likewise would have informed her client, but she would not have recommended it.

Accordingly,

IT IS ORDERED that judgment be entered in favor defendant, Aetna Life and Casualty Company, and against plaintiff, Mission Insurance Company, dismissing plaintiff's suit with prejudice and costs.