[No. A046045. First Dist., Div. Three. Feb. 6, 1991.]

DIAMOND HEIGHTS HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v.
NATIONAL AMERICAN INSURANCE COMPANY et al., Defendants and Respondents.

564

566

**COUNSEL**

Bickel & Coleman, Branden E. Bickel and William H. Curtis for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, George E. Sayre, Graziella Walsh Coggan, Tarkington, O'Connor & O'Neill, David H. Waters, Norman L. Chong, Acker, Kowalick & Whipple, Stephen Acker, Charissa Dorian and Derek S. Goulding for Defendants and Respondents.

**OPINION**

**STRANKMAN, J.—**

### I. *Overview*

The instant action follows the settlement of an underlying action filed by plaintiff and appellant Diamond Heights Homeowners Association (Association), a California corporation, against Diamond Heights Associates (Diamond Heights), the developer of a condominium project, and Alpha Land Company (Alpha), the general contractor, among other defendants, seeking damages for construction defects and deficiencies in the condominium project. The complaint stated causes of action for negligence, strict liability, and breach of warranty.

The parties ultimately entered into a settlement of the underlying litigation which provided for a stipulated judgment in favor of Association and against Diamond Heights and Alpha in the amount of $2,671,000. The total settlement included: (1) the stipulated judgment; (2) cash contributions by Diamond Heights and Alpha in the sum of $1,607,781.82, representing the remaining limits of their insurance coverage under certain comprehensive liability policies, and a cash contribution of the architect and two subcontractors in the sum of $100,000, for a total cash payment of $1,707,781.82 in partial satisfaction of the judgment; and (3) an assignment of rights of Diamond Heights and Alpha to Association against their noncontributing insurance carriers for the balance of the judgment owing in the sum of $963,218.18. These noncontributing carriers were American Home Assurance Company (American), a New York corporation; National American Insurance Company (National), a Nebraska corporation; and Central National Insurance Company of Omaha (Central), a Nebraska corporation, the defendants and respondents in the instant action.

Diamond Heights and Alpha moved for an order confirming good faith settlement. (Code Civ. Proc., § 877.6.)[1] Central filed its objections thereto. Following a hearing, the trial court confirmed the settlement as made in good faith and free from collusion.

Following confirmation of the settlement, Association initiated this action against American, National, and Central to satisfy the balance of the stipulated judgment. Each of these defendants had issued a policy of liability insurance to Diamond Heights or Alpha. National had issued a "primary" general liability policy with a liability coverage limit of $1 million. Central had issued an "umbrella" policy, including excess coverage (i.e., all primary or underlying insurance must be exhausted before excess coverage becomes effective) with a $3 million per occurrence limit. American had issued an umbrella policy with a $2.5 million per occurrence limit. Following discovery, the three defendant insurance carriers moved for summary judgment/summary adjudication of issues. (§ 437c.) American and National sought summary judgment on the ground of certain exclusionary provisions in their policies. Central sought summary judgment on the ground of exclusionary provisions in its policy as well as its contention that the stipulated judgment, which had been entered into without its consent, violated a specific condition to coverage under the policy.

The trial court granted summary judgment in favor of all three defendant insurance carriers. Association moved for reconsideration as to the order

---

[1] All further statutory references are to the Code of Civil Procedure unless indicated otherwise.

granting summary judgment in favor of Central, offering additional documentation and evidence. The trial court reconsidered but then confirmed its order granting summary judgment.

■ In reviewing the orders granting summary judgment, we independently review whether the papers filed in support of and in opposition to the motions for summary judgment show there were no triable issues of material fact, such that the moving parties were entitled to judgment as a matter of law. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

We affirm the judgment in favor of National and American but reverse the judgment in favor of Central.

## II. *Summary Judgment in Favor of National Was Proper*

■ A. *Pertinent policy exclusions.* National issued a comprehensive general liability policy to Diamond Heights and Alpha which contained the following exclusionary provision:[2] "This insurance does not apply: . . . (1) to property damage to the named insured's products arising out of such products or any part of such products; and . . . (m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."

These exclusions, referred to by the courts and commentators as the "work product" exclusion, constitute standard exclusions in the standard form comprehensive general liability policy issued to a general contractor. (See *Western Employers Ins. Co.* v. *Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1028 [194 Cal.Rptr. 688].) The exclusion precludes coverage for liability for damage to and deficiencies of the insured contractor's work product. It applies to the insured's defective work as well as to the insured's satisfactory work that is damaged by the insured's defective work. (*Id.,* at p. 1029.) The exclusion is consistent with the purpose of this type of policy which is neither a performance bond nor an all-risk policy. (*Id.,* at p. 1031.) The coverage afforded by such policy is for tort liability for physical damage to others; for example, liability for damage to an automobile caused by a falling wall defectively constructed by the insured. (*Id.,* at p. 1032.) The coverage is not for liability for economic loss based on a product or

[2] In support of its motion for summary judgment, National relied on a "premises alienated" exclusion as well as the work product exclusions. Because we find the work product exclusions alone bar Association's claim for coverage as a matter of law, we need not and therefore do not address the premises alienated exclusion.

completed work which is not that for which the damaged person bargained. (Henderson, *Insurance Protection for Products Liability and Completed Operations - What Every Lawyer Should Know* (1971) 50 Neb. L.Rev. 415, 441.)

The *Arciero* court explained: "This makes sense from the standpoint of the insurer and the insured. By excluding repair and replacement losses, the insurer gives the contractor an incentive to exercise care in workmanship thereby reducing the risk that is covered: damage to property of third parties. Coverage of repair and replacement costs would undermine this incentive. If the work failed the insurer would end up holding the scrap. Excluding repair and replacement costs also reduces the cost of the policy. The insurer is freed from administering frequent claims for minor repairs and can set its rate based on the less frequent but potentially large claims for damage to the property of others." (*Western Employers Ins. Co.* v. *Arciero & Sons, Inc., supra*, 146 Cal.App.3d at pp. 1031-1032.)

B. *The work product exclusion precludes coverage for Association's claimed losses in the underlying action.* Association's underlying action was brought pursuant to section 374, which grants owners' associations a limited right to bring actions on behalf of the individual owners, without joining the owners, to recover for damage to (1) common areas, or (2) the separate interests which the association is obligated to maintain or repair, or (3) the separate interests which arise out of damage to the common area.

Association's complaint in the underlying action alleged damages resulting from the defendants' negligence and faulty workmanship, as follows: "[D]efendants, and each of them, negligently and carelessly developed, designed, constructed, supplied, installed and repaired the subsoil, foundations, buildings, component parts, and other improvements to the project Common Area so as to cause the same to subside, crack, leak, deteriorate and fall into disrepair . . . ." The damage was alleged as follows: "The subsidence, cracks, leaks and excessive deterioration have required extensive repairs throughout the Diamond Heights Condominiums. As a consequence plaintiff must retain consultants . . . to advise it of the true nature and extent of . . . any common defects in the development, design and construction of the Diamond Heights Condominiums."

In response to interrogatories propounded by defense counsel requesting an itemization of the damages claimed, Association's counsel listed deficiencies in roofing, drainage system, siding, structural elements, electrical system; as well as application of asbestos spray, water penetration, leaks, inadequate foundations, and wood fungal decay.

The foregoing itemized damages are covered by the plain language of the work product exclusion, in that all such items comprise part of the work product of the developer and general contractor.

■ Association argues that consequential damages resulting from but not part of the contractor's work product are not covered by the work product exclusion, citing *Baugh Const. Co. v. Mission Ins. Co.* (9th Cir. 1988) 836 F.2d 1164. In *Baugh*, the Ninth Circuit held consequential damages such as damage to tenant improvements resulting from a contractor's faulty work are covered under a general liability policy, notwithstanding the work product exclusion. (*Id.*, at p. 1172.) Association identifies the consequential damages allegedly suffered here as health hazards to individual owners, water damage to their personal property such as furniture and drapes, and relocation expenses during repair work.

Here, unlike the case in *Baugh*, the consequential damages specified by Association were neither pled in the complaint nor identified in response to discovery requests. More significantly, under section 374, Association *could not seek such damages by its action* because they did not constitute damage to either the common area or separate interests in the condominium projects. Association therefore was precluded from seeking any consequential damages not excluded from coverage under the work product exclusion.

■ For the foregoing reasons, we conclude the record supports the trial court's finding there were no triable issues of material fact as to Association's claim for coverage under the National policy, and that such claim was barred by the work product exclusion as a matter of law.

### III. *Summary Judgment in Favor of American Was Proper*

American issued a liability policy to Alpha which contained the same work product exclusion as contained in the National policy. As the trial court ruled, this exclusion precluded coverage under the American policy as a matter of law for Association's claims for the same reasons the exclusion precluded coverage under the National policy.

### IV. *Summary Judgment in Favor of Central Must Be Reversed*

As stated, Central's umbrella policy provided coverage for losses in excess of other valid and collectible primary insurance. (See 39 Cal.Jur.3d, Insurance Contracts, § 500, p. 823.) The primary insurers undertook and paid all costs of the defense of the underlying litigation through settlement. Although advised of the pendency of the action and the settlement

negotiations, Central did not participate actively in the defense or the settlement of the action.

A. *Central's policy.* Central's policy contained a work product exclusion similar to that contained in the National and American policies. A "Contractor's Endorsement," however, made a part of the policy, appeared on its face to nullify this exclusion by providing: "It is hereby agreed that the exclusion relating to property damage to work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts, or equipment furnished in connection therewith is *deleted.*" (Italics added.)

Condition G of the policy provided for notice of an occurrence for which the insured could be held liable to be sent to Central as soon as practicable.

Condition H of the policy provided as to any action instituted against the insured: "ASSISTANCE AND COOPERATION. [Central] shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but [Central] shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve [Central], in which event the Insured and [Central] shall cooperate in all things in the defense of such claim, suit or proceeding."

Condition J of the policy included the standard "no action" clause providing that the insured could make a claim of loss "after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by written agreement of the Insured, the claimant, *and the Company* [*Central*]." (Italics added.)

B. *Central's response to underlying litigation.* By letter dated March 13, 1987, the defense counsel retained by the primary carriers notified Central of the pendency of the underlying litigation and that the plaintiffs' demand exceeded primary coverage limits. Central responded that it would retain counsel to monitor the case and evaluate the potential exposure to Central's coverage. In April 1987, defense counsel advised Central that plaintiffs' most recent settlement demand was $3,351,853. By letter dated May 19, 1987, defense counsel advised Central "that it is most likely that the primary policy limits will be exhausted" and requested an immediate response as to whether or not there was any denial of coverage.

In June 1987, counsel retained by Central requested copies of all pleadings, deposition summaries and other discovery documentation, and status reports. On June 10, 1987, defense counsel met with Central's counsel to review the status of and evaluate the case. By letter dated August 20, 1987, Central's counsel advised that it was investigating the claim against Alpha but reserved all rights under the policy, and confirmed that as an excess carrier it owed no present duty to defend.

In November 1987, defense counsel advised Central's counsel that at a mandatory settlement conference, two primary carriers had committed their policy limits in the total amount of $1.5 million in settlement of the action, which offer, combined with $100,000 from other defendants, had been made to plaintiffs' counsel. He further advised that plaintiffs' counsel informed them that his estimate of repair costs, exclusive of asbestos abatement costs, exceeded $2 million and that asbestos abatement work would be costly. By letter dated November 5, 1987, defense counsel advised Central of plaintiffs' settlement demand of $2,671,064, and stated: "Since this figure clearly exceeds the policy limits of St. Paul and Consolidated American, which limits have been 'put on the table' (approximately $1,600,000), your immediate statement of position is required . . . . [¶] The trial remains set for *Monday, November 9, 1987.*" Central responded by offering to contribute $150,000 towards settlement.

On November 9, 1987, after the case was assigned to trial, the parties reached a settlement agreement in open court. Counsel for Central was present and objected to the settlement at the time it was placed on the record.

As stated previously, counsel then filed a motion for an order confirming good faith settlement pursuant to section 877.6. Central filed a notice of its objections and nonconsent to the settlement on the grounds that the amount of the stipulated judgment was unreasonable and appeared to be the result of collusion between plaintiffs and defendants. Following a hearing, the trial court confirmed the settlement as entered in good faith, and made the following findings of fact: that the case presented a situation of clear liability on the part of Diamond Heights, as developer, and Alpha, as general contractor, and the amount paid in settlement constituted a fair representation of the potential recovery, in that various experts placed Association's damages between $1.2 million and $3.8 million; and there was no evidence of fraud or collusion.

Before turning to Central's motion for summary judgment, we comment briefly on the nature of primary and excess insurance coverage, as

summarized in *Transit Casualty Co.* v. *Spink Corp.* (1979) 94 Cal.App.3d 124 [156 Cal.Rptr. 360] (disapproved in part in *Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912 [164 Cal.Rptr. 709, 610 P.2d 1038]): "The policyholder pays for two kinds of liability coverage, each at a different rate. The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier. It takes into account costs of defense, including legal fees, which the primary insurer normally provides. The excess carrier is less frequently confronted with loss possibilities and, when it is, may employ local adjusters. The primary insurer is assisted, not impeded, by the active participation of another carrier with a stake in the negotiations. Self-interest will impel the primary carrier to take the lead when settlement value is well within its policy limits, the excess carrier when the claim invades its own policy exposure. When settlement value hovers over the fringes of both policies, both carriers may collaborate." (*Transit Casualty Co., supra,* at p. 135.)

C. *Central's motion for summary judgment.* Central moved for summary judgment on the ground of the work product exclusion, and on the alternate ground that the stipulated judgement entered without its consent violated condition J of its policy, cited *ante.* Central argued that it had the right to object to the settlement, and its lack of consent thereto barred Association's claim of loss under condition J. In support of this argument, Central cited authority for the proposition that absent a demonstration of bad faith, a liability insurer acts within its contract rights whenever it refuses to voluntarily settle a claim and insists on adjudication of the matter on the merits. (See *Clark* v. *Bellefonte Ins. Co.* (1980) 113 Cal.App.3d 326, 337 [169 Cal.Rptr. 832].)

In opposition to the motion for summary judgment, Association produced the "Contractor's Endorsement," which appeared to nullify the work product exclusion. Association also argued that Central did not have the right to object to the settlement where the trial court found it was made in good faith and free from fraud or collusion. Association further argued that the evidence established Central had waived or was estopped to assert condition J of the policy.

The trial court granted summary judgment in favor of Central on the ground the settlement did not comply with condition J, in that "Central was not obligated to consent to the settlement despite the fact that it was entered with the court's assistance, and the defense of the action was never tendered to or rejected by [Central]." In confirming the order granting summary judgment following reconsideration, the court stated: "When the primary

carriers agreed to pay their policy limits, plaintiff did not demand that Central either approve the settlement or accept the defense of the action. Since Central objected to the settlement but was not asked to assume the defense, there was no waiver or estoppel with respect to the provisions of Condition J of the policy."

 D. *Duty of primary and excess insurers to undertake defense; insurer's authority to settle and duty of good faith in settling case.* ■ Generally, the primary insurer alone owes a duty to provide and bear all costs of the defense, with a corresponding right of control over the defense. The excess carrier has no right or duty to participate in the defense, absent contract language to the contrary, until the primary policy limits are exhausted. (*Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 370-371 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75]; *Continental Casualty Co.* v. *Royal Ins. Co.* (1990) 219 Cal.App.3d 111, 119 [268 Cal.Rptr. 193]; *Continental Cas. Co.* v. *United States Fid. & Guar. Co.* (N.D.Cal. 1981) 516 F.Supp. 384, 387-388, 393.)[3] [4]

 Where the excess policy contains language similar to condition H in Central's policy, the primary insurer ordinarily remains responsible for the defense until final resolution of the litigation. Thus, even if the insured's potential liability exceeds primary policy limits and invades excess coverage, and the primary insurer is willing to pay to the excess insurer the primary policy limits, the primary insurer may not as a matter of right tender the defense of the action to the excess insurer or otherwise relieve itself of the duty to defend. (*Chubb/Pacific Indemnity Group* v. *Insurance Co. of North America* (1987) 188 Cal.App.3d 691, 698 [233 Cal.Rptr. 539]; see *Continental Casualty Co.* v. *Royal Ins. Co., supra,* 219 Cal.App.3d at p. 123.) The primary insurer's duty to defend is not extinguished until settlement or payment of judgment. (*Chubb/Pacific Indemnity Group, supra,* at p. 698.) In *Chubb/Pacific,* the excess insurance policy contained language similar to condition H. The primary insurer, however, contended that by ceding its policy limits to the excess carrier it had an equitable right to have

---

[3] "The duty of the primary insurer is not divisible or limited to those suits that are within the policy limits and the insuring agreement creates a duty to defend any suit regardless of the amount claimed against the insured and the excess insurer is a third party beneficiary of that agreement." (7C Appleman, Insurance Law and Practice (Berdal ed. 1979) § 4682, p. 28.)

[4] In *Signal Companies, Inc.* v. *Harbor Ins. Co., supra,* 27 Cal.3d 359, the court stated an excess carrier might in a given case be required to contribute to the continuing costs of defense after the primary coverage limits are exhausted. (*Id.,* at pp. 370-371.)

In *Johnson* v. *Continental Ins. Companies* (1988) 202 Cal.App.3d 477, 481-486 [248 Cal.Rptr. 412], the court found the insurer's duty to defend never arose when it tendered its policy limits in response to the insured's demand that it do so before the initiation of any litigation.

the excess carrier assume the costs of defense. (188 Cal.App.3d at p. 696.) The court disagreed, stating: "Clearly, the respective policy premiums charged were predicated on the respective obligations assumed by the carriers. If [primary insurer's] position were adopted, it would mean that any primary insurer which contracted to provide a defense in addition to policy limits could walk away from that obligation, whenever the insured had excess coverage, by simply acknowledging its separate contractual duty, to pay policy limits upon settlement or judgment, a highly inequitable result." (*Id.*, at pp. 698-699, fn. omitted.)

■ As stated, the primary insurer has control over the defense which arises from its duty to defend. (See generally 7C Appleman, *op. cit. supra*, § 4681, pp. 3-4.) The right of control extends to all aspects of the defense, including the negotiation of any settlement prior to trial. (*Continental Cas. Co.* v. *United States Fid. & Guar. Co., supra*, 516 F.Supp. at p. 392; *Continental Casualty Co.* v. *Royal Ins. Co., supra*, 219 Cal.App.3d at p. 119.) The excess insurer has no right to step in and try to settle the case (*ibid.*), unless perhaps it has exercised its option under a provision such as condition H to associate with the primary insurer in the defense.

■ Any insurer, whether excess or primary, in conducting settlement negotiations, is subject to an implied duty of good faith and fair dealing which requires it to consider the interests of the insured equally with its own and evaluate settlement proposals as though it alone carried the entire risk of loss. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16 [123 Cal.Rptr. 288, 538 P.2d 744]; *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 188 [231 Cal.Rptr. 791]; *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 873 [110 Cal.Rptr. 511].) Such duty carries with it an obligation to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of any settlement demand. (*Garner* v. *American Mut. Liability Ins. Co.* (1973) 31 Cal.App.3d 843, 847-848 [107 Cal.Rptr. 604]; *Continental Cas. Co.* v. *United States Fid. & Guar. Co., supra*, 516 F.Supp. at p. 389.)

■ The duty of good faith and fair dealing in an insurance policy "is a two-way street," running from the insured to his or her insurer as well as vice versa. (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038], citing with approval *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91].) Thus, in evaluating settlement of a claim where the insured and insurer may both incur liability, each assumes an obligation to act in good faith, to face the facts realistically, and to

maintain a mutual respect for the interests of the other. (7C Appleman, *op. cit. supra* (1990 pocket pt.) § 4712, p. 70.)

■ Where there is excess coverage, the excess carrier, under the doctrine of equitable subrogation, may be subrogated to the position of the insured vis-à-vis the primary insurer's duty of good faith. The primary insurer accordingly owes a duty of good faith to the excess carrier which is identical to that owed to its insured. (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc., supra*, 26 Cal.3d at pp. 917-918; see *Signal Companies, Inc.* v. *Harbor Ins. Co., supra*, 27 Cal.3d at p. 365.) It must consider in good faith the interests of the excess insurer equally with its own (*Continental Cas. Co.* v. *United States Fid. & Guar. Co., supra*, 516 F.Supp. at p. 387), and must conduct the defense of the litigation, including settlement negotiations, so as not to expose the excess insurer to unwarranted liabilities. (Knepper, *Relationships Between Primary and Excess Carriers in Cases Where Judgment or Settlement Value Will Exhaust the Primary Coverage* (1953) 20 Ins. Counsel J. 207 (hereafter Knepper); Lanzone, *Resolving Conflicts Between Primary and Excess Insurers* (1975) 635 Ins. L.J. 733 (hereafter Lanzone).) An excess insurer may therefore recover against the primary insurer when, for example, the latter wrongfully refuses to accept a settlement offer within primary policy limits, where, prior to trial, there was a substantial likelihood of recovery in excess of those limits. (*Commercial Union, supra*, at p. 917; *Continental Casualty Co.* v. *Royal Ins. Co., supra*, 219 Cal.App.3d at p. 117; *Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031, 1050 [143 Cal.Rptr. 415]; see generally, Lanzone, *op. cit. supra*, at p. 737.)

F. *Issues and discussion.* ■ We first turn to the trial court's stated basis for granting summary judgment in favor of Central, i.e., the insured's claim against Central was barred by reason of its failure to demand that Central undertake the defense of the action prior to entering into the settlement. We find such reasoning inconsistent with established law discussed *ante*, and the uncontroverted pertinent facts. The primary carriers, acting on behalf of their insureds, were neither obligated nor entitled to make a formal demand upon Central to undertake the defense before proceeding to settle the case. Under the express language of condition H, as construed by *Chubb/Pacific*, the primary carriers were *precluded* from tendering responsibility for the defense prior to settlement or final judgment.

Central, as the beneficiary of condition H, had the right to waive its provisions and consent to take over the defense from the primary insurers and continue the proceeding instead of settling. (See Knepper, *op. cit. supra*, 20 Ins. Counsel J. at p. 208.) The record indicates that Central was afforded

every opportunity of doing so up through the time of settlement. There is no showing it ever availed itself of this opportunity, or made any overture whatsoever to the primary insurers' counsel to assume the defense. The record shows, at the least, that there is a triable issue of fact as to whether Central was afforded a reasonable opportunity of undertaking the defense in order to avoid settlement.

 Having concluded the trial court's stated reasons do not support its ruling in favor of Central, we turn to the issues which we find are dispositive of the appeal: Were the primary insurers entitled to settle the case for an amount which invaded excess coverage without the excess insurer's consent? Conversely, did the excess insurer have the absolute right under condition J to object to and therefore preclude any settlement which invaded excess coverage, even if reasonable and made in good faith, thereby compelling the primary insurer to continue the litigation and provide a defense through trial? We find these questions are of first impression under California law.

We conclude a primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage, and that the primary insurer may enter into such settlement binding upon the excess insurer without the excess insurer's consent, notwithstanding the "no action" clause under condition J, subject to certain conditions. The legal basis and policy considerations which support our conclusion are set forth below.

 As discussed *ante*, under the doctrine of equitable subrogation, the excess insurer may assume the rights of the insured vis-á-vis the primary insurer incident to the settlement of a claim. Correspondingly, under the same doctrine, the excess insurer should assume the insured's obligations owing to the primary insurer. (See *Valentine* v. *Aetna Ins. Co.* (9th Cir. 1977) 564 F.2d 292, 297.) One of these obligations, as discussed *ante*, is where a claim is made against an insured which may exceed policy limits; in such case the insured as well as the insurer must evaluate settlement options in good faith, realistically, and with a mutual respect for the interests of the other. (7C Appleman, *op. cit. supra*, § 4712, p. 70.) Thus, the excess insurer, in evaluating the reasonableness of a settlement negotiated by the primary insurer, must consider whether the settlement bears a reasonable relation to the potential for liability and maximum likely recovery if the case proceeds to trial, and, in addition, the costs of defense and burdens imposed upon all parties if the litigation continues. Consistent with its good faith duty, the excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial, bearing the full costs of defense. A contrary rule would impose the same unnecessary

burdens upon the primary insurer and the parties to the action, among others, as does the primary insurer's breach of its good faith duty to settle: " '. . . [I]t imperils the public and judicial interests in fair and reasonable settlement of lawsuits . . . .' " (*Valentine v. Aetna Ins. Co., supra*, 564 F.2d at p. 297; see *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group, supra*, 76 Cal.App.3d at p. 1045.)

 Although such holding is in apparent conflict with the "no action" clause of condition J, we conclude the excess insurer *may* waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense. In a somewhat analogous situation, when a primary insurer wrongfully denies coverage, unreasonably delays processing a claim, or refuses to defend an action against the insured as required by the policy, the insured is entitled to make a reasonable settlement of the claim in good faith and then sue for reimbursement, even though the policy prohibits settlements without the consent of the insurer. (*Phoenix Ins. Co. v. United States Fire Ins. Co.* (1987) 189 Cal.App.3d 1511, 1526 [235 Cal.Rptr. 185]; *Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134, 146 [85 Cal.Rptr. 693].) The insurer is deemed to have waived its rights under the " 'no action' " clause by such conduct constituting a breach of its obligations under the policy. (7C Appleman, *op. cit. supra*, § 4714, pp. 526-530.) In *Fireman's Fund Ins. Co. v. Security Ins. Co.* (1976) 72 N.J. 63 [367 A.2d 864], the court held that where the liability insurer fails to make an honest and intelligent evaluation of a case for settlement purposes and fails to consider a reasonable offer to settle for an amount in excess of its policy limits, it breaches the implied covenant of good faith and fair dealing. The insured then is free, despite a no action clause, to minimize potential liability and agree to a reasonable settlement and then seek reimbursement from the insurer. The court stated that "[w]hile the right to control settlements reserved to insurers is an important and significant provision of the policy contract [citations], it is a right which an insurer forfeits when it violates its own contractual obligation to the insured." (*Id.*, at p. 868.)

Central argued below that where, as here, the potential liability does not exceed excess policy limits ($3.8 million estimated maximum potential liability and $4.5 million combined primary and excess coverage), the excess insurer should have the absolute right to object to the settlement. Central cited the rule that where maximum potential loss does not exceed liability policy limits, the insurer has the absolute right to control the litigation and

settlement, because the insured is not subjected to any risk of loss. (See 7C Appleman, *op. cit. supra*, § 4711, pp. 368-369.)[5]

We find this argument unpersuasive. In a case where probable liability far exceeds primary policy limits and invades excess limits, the excess insurer, if given the authority, might object to reasonable settlements simply because all costs of litigation would be borne by the primary insurer, and the amount of potential liability if the case proceeded to trial might not be substantially greater than the amount to be paid in settlement. The excess insurer would get a "free ride" at the expense of the primary insurer to the detriment of all other parties involved.

The excess insurer is not without a means of avoiding a proposed settlement or challenging a final settlement. First, as stated, it may voluntarily waive policy provisions such as condition H and agree to undertake the defense (once the primary insurer tenders its full policy limits) and either conduct its own settlement negotiations or take the action to trial. It may also challenge the settlement on the ground of unreasonableness or that it is a product of collusion between primary insurer and insured.[6]

An appropriate time for the insurer to present objections to the settlement is, as occurred in the instant case, at the good faith confirmation hearing pursuant to section 877.6, if there is one. If the excess insurer asserts the right to object, and is accorded due process in presenting its objections to the settlement, and the trial court confirms the settlement as made in good faith, the excess insurer stands in the position of a "co-obligor" barred from making a claim of bad faith against the settling parties. (§ 877.6, subd. (c).) The excess insurer's remedy, if aggrieved by the good faith confirmation, is to petition the court for writ of mandate. (§ 877.6, subd. (e).)

In the instant case, Central asserted the right to object to the settlement, and did put its objections on the record. All parties, including Central, had

[5] In its supplemental letter briefing, Central concedes that it has no absolute right to veto a reasonable settlement.

[6] For example, in a Minnesota personal injury case, the trial court entered a directed verdict on very tenuous grounds against the defendant insured and other defendants, which was reduced to a judgment. Because the trial court failed to rule on posttrial motions, there was no opportunity to appeal from the judgment. The insured then dismissed its insurer's counsel and proceeded to enter into a settlement, without the consent of the insurer, whereby he would pay nothing and his insurer was obligated to pay the full amount of the judgment. The insurer refused to pay and filed an action challenging the settlement. The court held that where the validity of the underlying judgment was questionable on its face, and the settlement did not reflect a reasonable bargain but rather a collusive attempt to impose an uncompromised full balance of the judgment upon the insurer, the settlement was not binding on the insurer. (*Sargent* v. *Johnson* (8th Cir. 1977) 551 F.2d 221, 232.)

the opportunity to participate at the section 877.6 hearing, present evidence and arguments, and fully litigate the issues of good faith and reasonableness. Thereafter, Central, as an aggrieved party, failed to avail itself of the right to challenge the confirmation order by petitioning for writ of mandate. Central's claims of bad faith and collusion in the instant action are therefore barred as a matter of law under section 877.6. They are also barred under principles of res judicata and collateral estoppel, where Central had an identity of at least certain interests with its insured, and had the opportunity to present its objections to the settlement in protection of its own interests. (See generally, 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 193, pp. 627-628, 283, p. 721, 287, pp. 723-724.)

We conclude, under the foregoing analysis, that Central did not establish as a matter of law that the primary insurers were required to tender a formal demand that Central undertake the defense before entering into the settlement. The record further shows Central's papers filed in support of summary judgment did not dispose of the material factual issue of whether Central waived its rights under condition J, including the issue of whether Central was afforded a reasonable opportunity to undertake the defense prior to the settlement. The trial court's entry of summary judgment in favor of Central on the grounds the primary insurers did not tender the defense to Central before settling, and that the settlement did not comply with condition J, therefore constituted error. Summary judgment should have been denied.

Our ruling does not affect the issue raised below of the effect of the work product exclusion and the contractor's endorsement on Association's claim of coverage.

## V. *Disposition*

The judgments in favor of American and National are affirmed. The judgment in favor of Central is reversed. American and National to recover their costs on appeal against Association. Association to recover costs on appeal allocable to appeal from judgment in favor of Central against Central.

Merrill, Acting P. J., and Chin, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 16, 1991.