WARNER, Judge.
North American Van Lines (NAVL) appeals from a final order dismissing its complaint against its insurance carriers with prejudice. The trial court found that all of the claims for breach of contract, bad faith, intentional interference, and conspiracy were barred. The court held that an excess judgment in a third party action was necessary to pursue a bad faith action against the carriers and that all of the remaining counts were simply variations of the bad faith count. Because bad faith is simply a sub-category of breach of contract, we hold that under the facts of this case an excess judgment is not necessary to assert the causes of action alleged.
I. Facts
We set forth the facts as contained in the complaint which we take as true for purposes of review of an order dismissing a complaint for failure to state a cause of action. Aaron v. Allstate Ins. Co., 559 So.2d 275 (Fla. 4th DCA 1990).
Donna Michaud was seriously injured and her husband and three children were killed in a collision with one of NAVL’s tractor-trailer rigs. As a result, she filed suit against NAVL, its agent, Effort Enterprises (Effort), and the driver of the tractor-trailer. Effort had entered into an indemnity agreement with NAVL for accidents such as the subject one. Effort’s insurance provided primary insurance for the rig and driver involved in the accident.
NAVL was insured by National Union Insurance Company (National Union) and Lexington Insurance Company (Lexington). Lexington is a corporate subsidiary of National Union. National Union provided the first layer of coverage to NAVL in the amount of $5 million with a $1 million deductible. Lexington then provided a second layer of coverage under a policy providing limits of $20 million in excess of National Union’s $5 million coverage.
As will be set forth more fully below, both policies obligated NAVL to handle all claims. To that end, NAVL and Effort both conducted mock jury trials and ascertained that there was a potential for a huge jury verdict exhausting all available insurance coverage. Around March 1992, following initial settlement negotiations, Effort’s insurance carriers tendered their full policy limits to Michaud, which far exceeded the $1 million deductible on the National Union policy. Michaud continued to demand a settlement amount from all parties which exceeded Effort’s limits and *1328 National Union’s coverage but did not exceed the additional coverage of Lexington.
Beginning in the spring of 1992, NAVL repeatedly requested that its insurers settle the claims against it. National Union refused to tender its limits, and Lexington also refused, claiming that exhaustion of National Union’s limits was a condition precedent to Lexington’s liability. Over the next year the insurance carriers steadily refused to settle, while continued discovery in the case by Mi-chaud made her case much stronger against NAVL and increased the likely value of the case.
A year later, with no movement by the insurance carriers on settlement, and fearing a devastating verdict in the upcoming trial, NAVL offered to contribute to a settlement if National Union would put up its limits. National Union finally tendered its limits on the condition that NAVL advance $1 million, even though Effort’s insurance carrier was at all times ready to pay its limits. NAVL agreed without prejudice to its right to recover its million dollars later.
On the eve of trial, Michaud’s attorney’s made a settlement demand exceeding National Union’s limits but within those of Lexington, but Lexington still refused to authorize settlement. NAVL was faced with near certainty of a large judgment against it, exceeding all available coverage, and with the possibility of irreparable injury to its corporate image and relationships with financial institutions and others necessary for a viable existence. Under the circumstances, NAVL was forced to contribute the balance of the funds necessary to settle the litigation with Michaud, subject to a reservation of its rights against its insurers. The total cost to NAVL was $7 million.
NAVL filed suit against its insurance companies, National Union and Lexington, in a nine count complaint. Count I alleged a breach of contract against National Union, contending that it breached its duty to investigate, evaluate, and pay a reasonable settlement of the underlying claim within a reasonable period of time. NAVL alleged that because of National Union’s delay in tendering its policy limits, the settlement value of the litigation increased, requiring NAVL ultimately to expend more money to settle Donna Michaud’s claim. Count II alleged a breach of contract action against Lexington, reciting that Lexington had breached its duty to fund a good faith settlement of a valid claim. It further alleged that Lexington failed to reimburse NAVL for the full amount of the good faith settlement in the underlying litigation, to which NAVL had contributed its own funds, as well as NAVL’s costs in the underlying litigation. Count III alleged a breach of contract against both Lexington and National Union by requiring NAVL to contribute $1 million to satisfy the deductible when the payment of Effort’s insurance carriers more than satisfied the deductible requirement. Counts IV and V alleged bad faith actions against both Lexington and National Union. Counts VI through VIII alleged conspiracy and intentional interference with the insurance contracts by the parent groups of the insurance companies as well as the companies themselves as to each other’s contracts with NAVL. Finally, Count IX sought recovery against Effort for indemnity pursuant to the indemnity agreement between NAVL and Effort.
In granting National Union’s and Lexington’s motions to dismiss, the trial court held that a judgment in excess of the policy limits is a requirement for any action against an insurer for bad faith refusal to settle underlying litigation. On motion for clarification the trial court granted the motion to dismiss as to all counts, determining that an excess judgment is a requirement for any action against an insurer arising from a refusal to settle. Thus, the trial court dismissed NAVL’s case in its entirety, prompting this appeal.
II. The Policy Language
First, it is important to examine the National Union and Lexington policies and to define the relationships between the parties to this transaction.[1] The policy of insurance *1329 that NAVL has with National Union is not a true liability policy but it is similar to a contract for indemnity insurance. This important distinction is illustrated in State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55 (Fla.1995):
Under indemnity policies, the insured defended the claim and the insurance company simply paid a claim against the insured after the claim was concluded. Under liability policies, however, insurance companies took on the obligation of defending the insured, which, in turn, made insureds dependent on the acts of the insurers; insurers had the power to settle and foreclose an insured’s exposure or to refuse to settle and leave the insured exposed to liability in excess of policy limits.
Id. at 58. While the National Union policy has some provisions which may not appear in true indemnity policies, the important feature is that under the policy terms, NAVL had the duty to defend itself and prudently settle claims.
National Union insured NAVL for $5 million per occurrence, subject to a $1 million deductible. As part of the policy provisions, the contract provides:
ASSISTANCE AND COOPERATION OF THE INSURED: The Company shall not be called upon to assume charge of the defense or settlement of any claims made or suits brought or proceedings instituted against the Insured. The Insured shall be solely responsible for the investigation and defense of any claim made or suit brought or proceedings against the Insured to which this Policy would apply. The Insured shall use diligence and prudence to settle all such claims and suits whieh in the exercise of sound judgment should be settled, provided however, that the Insured shall not make or agree to any settlement for any sum in excess of the deductible amount without the approval of the Company.
The Company shall have the right and shall be given the opportunity to associate with the Insured in the defense and control of any claim, suit or proceeding which involves or appears reasonably like [sic] to involve the Company and in which event the Insured and the Company shall cooperate in all things in defense of such claim, suit or proceeding.
The Company, if it so elects and [in] its sole option, shall have the right to assume complete control of any claim which appears likely to involve the Company’s Limit of Liability under this policy.
National Union carried the first level of insurance for NAVL. The National Union policy provided that the company would pay the ultimate net loss within its policy limits. This included not only the amount of any judgment or settlement but also the expenses of the investigation and defense of any claim. However, it would not be liable to pay for any judgment or settlement or contribute to any defense costs once its policy limits were exhausted by its payment of judgments or settlement.
NAVL also had an excess policy through Lexington with policy limits of $20 million. The Lexington policy provided:
Coverage — To pay on behalf of the Insured the ultimate net loss in excess of the retained limit hereinafter defined, which the Insured shall become legally obligated to pay as damages by reason of the liability imposed upon the Insured by law, or assumed by the Insured under contract because of — (a) Personal Injury, including death ...
The ultimate net loss was defined by Lexington as follows:
Ultimate Net Loss — Except as provided in Insuring Agreement II, “Defense”, the term “Ultimate Net Loss” shall mean the total sum which the Insured or any company as its insurer, or both become obligated to pay by reason of Personal Injury ... either through adjudication or compromise, and shall also include ... [medical expenses, etc.]
As is true with most excess insurance policies, the Lexington policy did not require *1330 Lexington to defend the underlying claim, leaving that responsibility to the insured (NAVL) or to the primary insurer (National Union):
[T]he Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Insured, but the Company shall have the right and shall be given the opportunity to associate ■with the Insured or the Insured’s underlying insurer, or both, in the defense and control of any claim, suit or proceeding relative to any occurrence where the claim or suit involves, or appears reasonably likely to involve the Company, in which event the Insured, the underlying insurers and the Company shall cooperate in all things in the defense of such claim, suit or proceeding.
Moreover, Lexington would be liable under the policy once the insured or its primary insurer paid the underlying limits:
Loss Payable. Liability of the Company under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured’s underlying insurer, shall have paid the amount of underlying limits on account of such occurrence. The Insured shall make a definite claim for any loss for which the Company may be liable under the policy within twelve (12) months after the Insured shall have paid an amount of ultimate net loss in excess of the amount borne by the Insured or the Insured’s underlying insurer(s) or after the Insured’s Liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company....
Where there was an exhaustion of underlying coverage, the Lexington policy incorporated the provisions of the underlying policy, namely the National Union policy, which, as stated above, provided that the insured could not make any agreement to settle without the approval of National Union.
III. Bad Faith as a Contract Action
When we consider bad faith as a breach of the contractual duty of good faith, the case and its resolution becomes clearer, as the allegations that the insurer breached its duty of good faith or breached other express contractual duties are just two sides of the same coin. In Florida, a bad faith claim is an action ex contractu. Nationwide Mut. Ins. Co. v. McNulty, 229 So.2d 585 (Fla.1969). The supreme court quoted with approval from the district court opinion, McNulty v. Nationwide Mut. Ins. Co., 221 So.2d 208 (Fla. 3d DCA1969):
The contractual duty of the insured [sic] to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding. Accordingly, when an insurer under such a policy contract undertakes to defend an action against the insured and becomes involved in negotiations for settlement, the law imposes the duty that it act therein in good faith. It follows that the cause of action for an ‘excess,’ where one arises from bad faith, is bottomed on the contract, and that the nature of an action thereon is ex contractu rather than in tort.
229 So.2d at 586. Thus, when bad faith in negotiating a settlement is alleged, the cause is one for breach of a contractual obligation implied in law, namely good faith. This obligation of good faith is implied in the contract because the insurer has taken over the entire defense of the matter and, in most contracts, the insured is prohibited from interfering in any manner with the litigation and settlement. As such, the insurer must exercise reasonable diligence in that regard. Auto Mut. Indent. Co. v. Shaw, 134 Fla. 815, 825-30, 184 So. 852, 857-58 (1938). This same rationale was applied in Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783 (Fla.1980):
For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.
Id. at 785. While the concept of bad faith arose in connection with liability policies, a good faith obligation is implied in all insur *1331 ance contracts. See DeCespedes v. Prudence Mut. Casualty Co., 193 So.2d 224 (Fla. 3d DCA 1966). Indeed, “[t]he duty of good faith and fair dealing in an insurance policy ⅛ a two way street,’ running from the insured to his or her insurer as well as vice versa.” Diamond Heights Homeowners Ass’n v. National Am. Ins. Co., 227 Cal.App.3d 563, 277 Cal.Rptr. 906, 914 (1991). This duty of good faith is the foundation of the cooperation clauses that are contained in most insurance policies.
The duty of good faith is also present in an indemnity type policy, although the relationship between the insured and the insurer changes. Often, excess insurance policies take the form of indemnity policies because they leave the duty to defend and settle a claim against the insured to the primary insurer, or in this case, the insured. Thus, an excess insurer can hold a primary insurer responsible for improper failure to settle a claim against the insured, because the primary insurer’s position is analogous to that of the insured. United States Fire Ins. Co. v. Morrison Assur. Co., 600 So.2d 1147 (Fla. 1st DCA 1992). Similarly, the duty of good faith engrafted into the contractual obligations of these policies requires that the insured exercise diligence and good faith in conducting the defense for the benefit of both the insured and the insurer who each have a financial stake in the proceedings.
A similar case is the California case of Diamond Heights Homeowners Association, 277 Cal.Rptr. at 906, which is relevant and persuasive because the legal principles on which it relies are also principles of Florida law. In Diamond Heights, a homeowner’s association was insured with several layers of insurance coverage. The primary insurer undertook and paid all of the costs of the defense of the underlying litigation. The primary insurer kept the excess insurer advised of the defense as well as settlement negotiations. A settlement demand was made, which demand exceeded the underlying coverage, and the excess insurer was requested to respond. The excess insurer offered to contribute only $150,000 toward the settlement, when approximately one million dollars was needed. The parties then reached an agreement at trial and a stipulated judgment was entered on the amount. The judgment creditor, under an assignment of rights from the insured, sued the excess insurer on the stipulated judgment. The trial court entered summary judgment for the excess insurer on the ground that the settlement, entered without its consent, violated the policy provision that the insured could make a claim of loss “after the Insured’s liability shall have been fixed and rendered certain either by final judgment against the insured after actual trial or by written agreement of the Insured, the claimant or the company.”[2] The court determined that if the primary insurer was paying its policy limit, then the choice to the primary carrier and the insured was to demand that the excess carrier either approve the settlement or accept the defense of the action. Since the primary carrier did not tender the defense to the excess insurer, there could be no liability on the excess insurer.
The appellate court noted that the policy had an assistance and cooperation clause, much like the ones found in both the National Union and Lexington policies in the instant case. Where the excess policy contains such a clause, the court determined that the primary insurer ordinarily remains responsible for the defense until final resolution of the litigation. Thus, it remains the primary insurer’s duty to defend, which is not extinguished until settlement or payment of the judgment. In considering the duties of the primary insurer and excess insurer in settlement, the court said:
Any insurer, whether excess or primary, in conducting settlement negotiations, is subject to an implied duty of good faith and fair dealing which requires it to consider the interests of the insured equally with its own and evaluate settlement proposals as though it alone carried the entire risk of loss.
*1332 227 Cal.App.3d at 578, 277 Cal.Rptr. at 914 (citations omitted). Because of this implied duty of good faith and fair dealing, which is a “two-way street,” the Diamond Heights court concluded that a primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage, and may enter into such a settlement without the excess insurer’s consent under conditions which recognize the reciprocal duty of good faith:
Consistent with its good faith duty, the excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial, bearing the full costs of defense. A contrary rule would impose the same unnecessary burdens upon the primary insurer and the parties to the action, among others, as does the primary insurer’s breach of its good faith duty to settle: ... [I]t imperils the public and judicial interests in fair and reasonable settlement of lawsuits.... ’ ” [Valentine v. Aetna Ins. Co., 564 F.2d 292, 297 (9th Cir.1977) ].
Id. at 916. The Diamond Heights court held that an excess insurer may waive its rights to approve a settlement if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense:
Although such holding is in apparent conflict with the “no action” clause of [the policy], we conclude the excess insurer may waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense. In a somewhat analogous situation, when a primary insurer wrongfully denies coverage, unreasonably delays processing a claim, or refuses to defend an action against the insured as required by the policy, the insured is entitled to make a reasonable settlement of the claim in good faith and then sue for reimbursement, even though the policy prohibits settlements without the consent of the insurer. The insurer is deemed to have waived its rights under the “no action” clause by such conduct constituting a breach of its obligations under the policy. In Fireman’s Fund Ins. Co. v. Security Ins. Co. (1976) 72 N.J. 63, 367 A.2d 864, the court held that where the liability insurer fails to make an honest and intelligent evaluation of a case for settlement purposes and fails to consider a reasonable offer to settle for an amount in excess of its policy limits, it breaches the implied covenant of good faith and fair dealing. The insured then is free, despite a no action clause, to minimize potential liability and agree to a reasonable settlement and then seek reimbursement from the insurer. The court stated that “[w]hile the right to control settlements reserved to insurers is an important and significant provision of the policy contract [citations], it is a right which an insurer forfeits when it violates its own contractual obligation to the insured.” (Id., 367 A.2d at p. 868).
Id. at 581, 277 Cal.Rptr. at 916 (some citations omitted).[3] The excess insurer also argued that where the maximum loss is within policy limits, it should have the absolute right to control the settlement. However, the court disagreed, noting that the excess insurer would essentially get a “free ride” because the primary insurer was required to pay for the costs of defense including trial if the case was not settled. Thus, absent collusion and unreasonableness in the settlement amount, the excess insurer would be liable for the settlement.
If we substitute NAVL for the primary insurer in Diamond Heights, the circumstances are nearly identical based on the allegations of the instant complaint. Here, NAVL, the insured, undertook the defense by contract. NAVL was obligated to both National Union and Lexington to adequately defend their interests in the litigation. It also had the duty to negotiate a prudent settlement. Both National Union and Lexington had a corresponding duty of good faith in evaluating any settlement offers, considering each other’s and the insured’s interests. Neither National Union nor Lexington could arbitrarily reject a reasonable settlement. If they could, the contract would be illusory. If they arbitrarily rejected a reasonable settlement, they breached their policy provisions, entitling NAVL to settle the *1333 case and to seek reimbursement. Of course, NAVL must prove at trial that the settlement was reasonable and made in good faith.
Thus, the bad faith action is essentially one for breach of contract, which includes, under the case law, an implied good faith obligation. No excess judgment is required, because the insured has paid an obligation for which the insurers should have been liable, had they not breached the contract. See Taylor v. Safeco Ins. Co., 361 So.2d 743 (Fla. 1st DCA 1978) (under a liability policy where the insurance company undertakes the duty to defend as well as settle the ease, the insurance company can breach its contractual obligation by refusing to defend; if the company refuses to defend, the insured can take control of the case, settle it, and then sue the insurance company for the damages it incurred in settling the action). Moreover, the practical reason underlying the requirement of an excess judgment in standard liability insurance cases is that until the insured is personally exposed to liability, the insured suffers no damages. Such a policy requires the insurer to defend as well as settle the case, and the insurer does not breach its obligations until an excess judgment which exposes the insured to liability is entered. However, if the insurer refuses to defend and the insured undertakes the defense and settles the case, the insured can certainly sue for reimbursements regardless of whether there is an excess judgment. See Taylor, 361 So.2d at 746 (citing Michigan Mut. Liab. Co. v. Mattox, 173 So.2d 754, 758 (Fla. 1st DCA 1965)); Cunningham v. Austin Ford, Inc., 189 So.2d 661, 666 (Fla. 3d DCA 1966); Phoenix Assur. Co. of New York v. Hendry Corp., 267 So.2d 92, 94 (Fla. 2d DCA 1972); 7A Appleman, Insurance Law and Practice § 4690 (1962 & Supp.1974). This line of authority is applicable to the breach in the instant case.[4]
The trial court relied heavily on Shuster v. South Broward Hosp. Dist. Physicians’ Prof. Liab. Ins. Trust, 591 So.2d 174 (Fla.1992), which is inapplicable. There, the court considered whether an insurer could be sued for bad faith where it had settled a case within the policy limits which caused other incidental damages to the insured. In Shuster, a physician sued his insurance company for settling a malpractice action against him. Although the settlement was well within the policy limits, the physician claimed that the insurance company should not have settled the case as it was one of questionable liability. The settlement caused him to be investigated by the Division of Professional Regulation, which he claimed damaged him. Because the policy of insurance in that case gave the insurer the right to defend and settle claims as it “deems expedient,” the insurer had broad discretion as to when and how to settle a case. The court’s opinion recognized that the language of the contract would control, and the “deems expedient” language of the contract granted authority to the insurer to be guided by its own self-interest when settling claims within the policy limits. Furthermore, in Shuster the company actually paid under the policy, thus preventing its insured from being exposed to a judgment, the very risk for which insurance is obtained. Thus, there was no breach of contract. Pullman-Peabody v. Liberty Mut. Ins. Co., an unreported decision of the Eleventh Circuit Court of Appeals (Nov. 26, 1992), cited by the appellees as controlling, is also distinguishable because in Pullman, like Shuster, the insurance company maintained control over the defense and settlement decision.
We therefore hold that the trial court erred in dismissing the bad faith counts of NAVL’s complaint.
IV. Breach of Insurance Contracts
Because bad faith is a sub-category of a breach of contract case, and an excess *1334 judgment is not required to state a cause of action for bad faith, it follows that no excess judgment is required to state a cause of action for the breach of the express contractual provisions of the contracts of insurance in this case. In addition, the breach of contract count against Lexington stated a cause of action for breach of specific contractual provisions independent of the duty of good faith. The complaint alleged that Lexington had a duty to reimburse NAVL for the amounts that NAVL expended in settling with the injured parties. This is based on the separate policy provision regarding losses payable set forth above. This provision for payment of a loss requires either that the insured pay the loss and then make a claim on the company or that the loss be the result of an actual trial in which damages are fixed or by agreement between the claimant, the insured, and the company. As NAVL alleged that it paid the loss, demanded payment from the company, and Lexington refused to make payment, NAVL stated a cause of action for breach of contract. The policy does not require an excess “judgment” at all. The policy only requires either that the insured pay a loss covered by the policy or that the insured suffer a judgment against it. To read the policy as the trial court did is to add a term to .the policy and to negate the very notion that this policy indemnifies NAVL for losses that it suffers.
In Count III, NAVL claimed that the insurance companies breached their contracts by requiring it to pay the $1 million deductible instead of applying the payments Effort’s insurance carriers had made to the settlement in satisfaction of the deductible for NAVL. Based on Florida Ins. Guar. Ass’n v. Jacques, 643 So.2d 101 (Fla. 4th DCA 1994), we hold that Count III stated a cause of action.
Because we have held that the bad faith and contract actions were not subject to dismissal, we also hold that the intentional interference and conspiracy counts are not subject to dismissal for failure to state a cause of action on the grounds relied upon by the trial court, namely the absence of an excess judgment.
Finally, the trial court should not have dismissed Count IX for indemnity against Effort. There was no pending motion to dismiss, and Effort had filed an answer to the complaint. The trial court’s reasoning that an excess judgment is required as to the insurance contracts did not apply to this indemnity count in any event.
For the foregoing reasons, we reverse and reinstate all counts of the complaint.
GUNTHER, C.J., concurs.
POLEN, J., concurs in part and dissents in part, with opinion.

. The policies were attached to the complaint. "When a party attaches exhibits to the complaint those exhibits become part of the pleading and the court will review those exhibits accordingly.”
*1329 Ginsberg v. Lennar Florida Holdings, Inc., 645 So.2d 490, 494 (Fla. 3d DCA 1994), rev. denied, 659 So.2d 272 (Fla.1995).

. This is similar to the policy provision in the Lexington policy, except that the "no action” clause of that policy also contains a provision that liability of the company attaches when the insured pays an amount of loss in excess of the amount borne by the underlying coverage.

. Fireman's Fund, addressed by the Diamond Heights court, was cited in the appellant’s brief.

. Although not argued by the parties, we think that as to the National Union policy, this case presents an "excess" situation. Even though National Union finally tendered its policy limits, its delay required NAVL to expend substantial additional funds defending the case, which by the terms of the policy would not be collectible once the policy limits were exhausted. Therefore, in a very real sense, the failure of the insurance company to pay a reasonable settlement exposed the insured to expenses of settlement and defense in excess of the policy amounts. Cf. United States Fire Ins. Co., 600 So.2d at 1147. As in Diamond Heights, National Union was obtaining a “free ride” by refusing to settle at an early stage of the proceedings.