[No. B199978. Second Dist., Div. One. Feb. 4, 2009.]

CEDRIC McCOY, Plaintiff and Respondent, v.
PROGRESSIVE WEST INSURANCE COMPANY, Defendant and
Appellant.

**COUNSEL**

Law Offices of Julia H. Azrael, Julia Azrael and John S. Curtis for Defendant and Appellant.

Andrews & Hensleigh and Joseph Andrews for Plaintiff and Respondent.

## Opinion

**BAUER, J.**[*]—Progressive West Insurance Company (Progressive) appeals from the amended judgment on special verdict in favor of Cedric McCoy on his insurance bad faith action arising from denial of his vehicle theft claim. Based on our review of the record and applicable law, we affirm the judgment.

The trial court properly refused to give Progressive's requested genuine dispute instructions. The court did not abuse its discretion in excluding evidence of domestic violence and evidence of, and comment on, an automobile accident, both of which are unrelated to the car theft. The court acted within its discretion in denying admission of the entire claims file and evidence in the form of the tapes, transcripts, and summaries of all recorded investigative statements where no good cause was shown. Progressive fails to show prejudice flowing from its unsuccessful evidentiary claims. Substantial evidence supports the bad faith finding and award of punitive damages.

### BACKGROUND

In his complaint, McCoy alleged: On or about March 31, 2004, his Ford Mustang was stolen in Las Vegas, Nevada, and when recovered, the Mustang, which had been burned and damaged, was "essentially of no value."[1] This theft was a covered loss under his policy, and McCoy promptly reported the loss to Progressive, his insurer. Progressive breached the insurance contract and violated the covenant of good faith and fair dealing by, among other things, failing "to promptly, fairly and fully investigate the claim" and by "unreasonably and without proper cause" withholding benefits owed him under the policy. Progressive answered with a general denial and asserted various affirmative defenses, including its investigation was "reasonable" and "within the standards for good claims handling."

At trial, McCoy testified he had been employed with the United States Navy for seven years as an air traffic controller and was a tower supervisor. On March 30, 2004, he went to a casino in Las Vegas. Upon his return about 3:00 or 3:30 the next morning, his car was missing from the casino parking lot. He notified the police and Progressive. McCoy denied he had anything to

---

[*] Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The first amended complaint pleaded four causes of action for breach of contract, breach of the covenant of good faith and fair dealing, unfair business practices (Bus. & Prof. Code, § 17200), and conversion/trespass to chattels. A directed verdict in favor of Progressive was granted on the conversion/trespass to chattels cause of action. On its own motion, the trial court granted judgment on the pleadings as to the unfair business practices cause of action.

do with the theft or burning of his car. He denied calling and telling his then wife Katrina his car had been stolen. He further denied telling his brother Clinton numerous times prior to that day he wanted to get rid of his car. McCoy also denied telling Katrina and Clinton he wanted to upgrade to a Cobra Mustang. About 2:00 p.m. that afternoon, the police notified McCoy his car had been recovered. Progressive never paid his claim.

Charles Chipps Morin, a Progressive special unit investigator (SUI), testified McCoy's Mustang had sustained damage to the front bumper, the controls by the driver's side door had been ripped out, and wires were exposed. The car also had been partially burned. Morin, who believed McCoy was involved in the theft of his car, observed no obvious trauma to the ignition and thought it was unusual that the expensive tires were still on the car. A credit check ran by Morin revealed McCoy paid on time. As of 2006, Morin had no specific proof that McCoy was involved in the theft of his own car. He acknowledged that Mustangs were frequently stolen and that Las Vegas was one of the car theft capitals in the United States. He further acknowledged that he had not ruled out whether the car had been stolen by means of a tow truck or duplicate key.

Katrina telephoned Morin regarding the car theft. On April 6, 2004, Morin took Katrina's statement. She related that McCoy had talked about disposing of his car for some time, and she referred Morin to Clinton for more information. On May 5, 2004, Morin spoke with Clinton, who appeared credible. Clinton told Morin that McCoy wanted to buy an expensive Cobra Mustang. On October 5, 2004, Katrina again called Morin and stuck to her original story.

Katrina told Morin that Clinton and McCoy had a mixed relationship, i.e., Clinton loved McCoy but McCoy had some behavior problems. Morin knew Katrina might have some hostility or ill will toward McCoy because of their divorce, which occurred in July 2004. Morin wanted to examine McCoy under oath and to meet face-to-face with Katrina and Clinton to assess their credibility. Progressive did not give him authorization to do so.

Morin acknowledged that, pursuant to SUI standard operating procedures, he was required to determine a claim was fraudulent before reporting the claim to the Department of Insurance (DOI) and not to report the claim to the police or any regulatory authority until after a claim decision had been made. He admitted that although the claim was not denied until March 2005, he already had contacted the DOI and various law enforcement officers and regulatory agents as early as April 9, 2004, and through January 19, 2005. He acknowledged on February 24, 2005, by letter, the DOI advised Progressive there was insufficient evidence to support a criminal investigation.

Anthony Prieto, Jr., a Progressive fire and theft representative, testified that McCoy's policy covered theft and was in effect at the time of the theft. McCoy's car was a total loss. Prieto suspected fraud on the part of McCoy, because McCoy and his friend Angela had travelled to Las Vegas from California in separate cars.

McCoy provided Prieto with a recorded statement on April 1, 2004. Prieto admitted McCoy also provided other documents Progressive requested and that McCoy's claim was not denied until March 15, 2005, or nine months after McCoy's affidavit of theft had been received. Prieto testified that Progressive had the duty to affirm or deny a coverage claim within 40 days or, if fraud were suspected, within 80 days. He admitted that if doubts arose during an investigation they would be resolved in favor of coverage for the insured.

Prieto acknowledged that a signed consent was required to remove major components from an insured's car and that McCoy's consent was only received on June 9, 2004, a date after Progressive had removed the car's steering column assembly.

Eugene Evans, McCoy's expert, testified that Progressive's claim handling was "below the standard . . . in [the] insurance industry, and that it didn't meet certain [DOI] regulations." Specifically, Progressive "failed to give the insured the benefit of the doubt" and "the investigation was conducted largely to prove what they had already concluded in their own minds. And no investigation was conducted to show that Mr. McCoy's claim might be valid."

Evans further opined that Progressive should have concluded McCoy's claim was valid and it should have paid the claim. He explained that, after investigating its initial suspicions of fraud, Progressive did not have enough information or evidence to conclude McCoy was "an insurance fraud." Evans testified it appeared McCoy had no financial motive, because he owed more on the vehicle than it was worth if sold, and, thus, "any loss on the vehicle . . . would have been based upon the actual cash value of the vehicle at the time of the loss, and [McCoy] would have still owed money to the financing company" in addition to having "to get another car and [make] payments on that."

He opined that neither McCoy's ex-wife nor McCoy's brother was a reliable witness. Katrina recanted her statements, and, after reading the transcripts of Clinton's examination and watching a "CD" of the examination, Evans felt it was not conclusive. He agreed with a note from a supervisor in the claims file stating: " 'We can't just rely on having two witnesses like this,

because they are—they are not conclusive. And if we don't come up with something else, we are going to have to pay the claim.' " He added "[a] tie goes to the insured. If you can't prove what is wrong, you pay the claim." Evans noted Progressive did not take into account the information favorable to McCoy, i.e., his longtime employment with the Navy, his responsible job, his payment of his bills, and his schooling.

He pointed out "80 days is the maximum that you are supposed to take to make up your mind about a claim," and Progressive went "far beyond that." Progressive also failed to comply with the DOI regulations regarding correspondence to keep the insured up to date about the claim.

Evans opined Progressive failed to follow its own SUI guidelines by attempting to turn over McCoy's claim to policing agencies before completing its investigation. Progressive also violated insurance industry practice by removing the steering column from McCoy's car before receiving written permission. He noted Progressive "damaged it in the process so that any subsequent physical investigation that [McCoy] might have done would have been of no value."

Gene Peter Irizarry, Progressive's expert, opined Progressive had handled McCoy's claim reasonably and consistent with insurance industry practice standards.

Eric Schnitzler testified coverage would be denied for a fraudulent claim and it was his decision, as Progressive's branch claims manager, to deny McCoy's claim. In so doing, he relied on the statements of Katrina and Clinton. Schnitzler also based his decision on what he considered circumstances inconsistent with theft by someone other than McCoy. He concluded the use of two cars to drive to Las Vegas indicated "this whole thing was planned. It was a setup." McCoy knew he needed another car to return to Los Angeles. Also suspicious were these facts: McCoy's car did not show up on the casino video security tapes; "there was no evidence of point of entry"; the wheels on the recovered Mustang appeared to be original equipment; and the unaltered ignition meant the right type of key must have been used in order to drive away the car.

In the first phase of the bifurcated trial, the jury returned a unanimous verdict in favor of McCoy on all the special verdict questions, including whether Progressive acted in bad faith and whether it acted with malice or oppression. In the second phase, which involved the sole issue of the amount of punitive damages, nine jurors agreed to an award of $100,000.

In denying Progressive's motion for a new trial and for judgment notwithstanding the verdict, the trial court reasoned: Ample evidence supported the

jury's verdicts that "in the colloquial sense . . . McCoy got a raw deal" and that, under the clear and convincing evidence standard, the award of punitive damages was justified. The court rejected Progressive's claim that it was "shortchanged in terms of admissible evidence" and found Progressive had "ample opportunity to explain" its handling of McCoy's claim. The court disagreed with Progressive's attack on its rulings excluding evidence under Evidence Code section 352, "be it parts of the claim file or our other evidence, and particularly this other accident situation" and stated "I would make the same rulings right now once again if we had it before us. And essentially we do."

After awarding McCoy fees in an uncontested amount and agreed upon costs, the trial court entered an amended judgment on special verdict. This appeal followed.

## DISCUSSION

### 1. *Special Genuine Dispute Instructions Properly Refused*

■ Progressive contends the trial court committed prejudicial error by refusing to give its proposed instructions Nos. 5 and 6 on the "genuine dispute" doctrine.[2] There was no error.

Progressive requested special instructions Nos. 5 and 6 based on the "genuine dispute" holding of *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335 [108 Cal.Rptr.2d 776] (*Chateau Chamberay*). The trial court refused, finding the genuine dispute doctrine was subsumed within the concept of what is reasonable and unreasonable as set forth in CACI No. 2331.

■ "The law implies a covenant of good faith and fair dealing in every insurance contract. [Citation.] Therefore, when an insurer unreasonably and in bad faith withholds payment on a claim of its insured, it is subject to liability in tort. [Citation.] An insurer may also breach the covenant of good faith and

---

[2] Proposed instruction No. 5 read: "When an insurer denies or delays payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability, the insurance company will not be liable in bad faith even though it may be liable for breach of contract."

Proposed instruction No. 6 read: "In determining whether or not an insurance company had a genuine dispute as to whether or not a loss was covered, you may consider among the following: (1) Whether the insurance company was guilty of misrepresenting the nature of the investigation; (2) Whether the insurance company adjusters and investigators lied during their depositions or to the insured; (3) Whether the insurance company dishonestly selected its experts; (4) Whether the insurance company experts were unreasonable; and, (5) Whether the insurance company failed to conduct a thorough investigation."

fair dealing when it fails to properly investigate its insured's claim. [Citation.] Under this implied promise, in determining whether to settle a claim, the insurer must give 'at least as much consideration to the welfare of its insured as it gives to its own interests.' [Citation.]" (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1096 [234 Cal.Rptr. 835]; see also *Chateau Chamberay, supra,* 90 Cal.App.4th at p. 345; see also *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 948 [43 Cal.Rptr.3d 468].)

■ The linchpin of a bad faith claim is that the denial of coverage was unreasonable. "Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*." (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1072 [56 Cal.Rptr.3d 312] (*Jordan*).) "Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. [Citation.]" (*Ibid.*)

"The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts." (*Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1292 [97 Cal.Rptr.2d 386].) Reliance on an expert, on the other hand, "will not automatically insulate an insurer from a bad faith claim based on a biased investigation." (*Chateau Chamberay, supra,* 90 Cal.App.4th at p. 348, italics omitted.) Although an insurer may rely on experts, summary judgment on a bad faith claim must be denied where the evidence shows "the insurer dishonestly selected its experts[,] the insurer's experts were unreasonable[,] [or] the insurer failed to conduct a thorough investigation." (*Id.* at pp. 348–349.)

In *Jordan,* the *Chateau Chamberay* court again addressed the genuine dispute doctrine in the context of motions for summary judgment. The court concluded "Allstate's bad faith conduct cannot be resolved on summary judgment," because Jordan had presented "evidence sufficient to support the conclusion that Allstate did indeed fail to conduct a full, fair, thorough and timely investigation of Jordan's claim," but "Allstate may well be able to produce evidence that all or part of Jordan's factual assertions are false, or that Allstate's acts or omissions as claimed by Jordan were justified or reasonable in the circumstances." (*Jordan, supra,* 148 Cal.App.4th at pp. 1076–1077.)

■ *Chateau Chamberay* and *Jordan,* neither of which involved a jury trial, thus do not constitute authority for a jury instruction on the genuine dispute doctrine. (*In re Chavez* (2003) 30 Cal.4th 643, 656 [134 Cal.Rptr.2d

54, 68 P.3d 347] ["As is well established, a case is authority only for a proposition actually considered and decided therein."].) Progressive has cited no applicable authority, nor have we found any, which would compel such instruction.

██ Our Supreme Court explained: "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. [Citations.] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723–724 [68 Cal.Rptr.3d 746, 171 P.3d 1082], fn. omitted; see *Fraley v. Allstate Ins. Co., supra*, 81 Cal.App.4th at p. 1293 [bad faith claim fails as matter of law where genuine dispute shown]; see also *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1240, fn. 7 [83 Cal.Rptr.3d 410] [whether genuine dispute exists as matter of law not subject to resolution at pleading stage].)

Moreover, the trial court properly instructed the jury on the issue of reasonableness pursuant to CACI Nos. 2331 and 2332.[3] Both parties agreed that these instructions be given. No further instruction in this regard was necessary.

2.–5.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3] CACI No. 2331 read in pertinent part: McCoy "must prove all of the following: . . . Progressive . . . unreasonably failed to pay policy benefits . . . ." CACI No. 2332 read in pertinent part: McCoy "must prove all of the following: . . . Progressive . . . unreasonably failed to properly investigate the loss and denied coverage/failed to pay insurance benefits . . . ."

[*]See footnote, *ante*, page 785.

## DISPOSITION

The judgment is affirmed. Respondent shall recover costs of appeal.

Mallano, P. J., and Rothschild, J., concurred.