**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TELEFLEX MEDICAL INCORPORATED, *Plaintiff-Appellee*, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *Defendant-Appellant.* | No. 14-56366 <br><br> D.C. No. 3:11-cv-01282-WQH-DHB <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted August 3, 2016
Pasadena, California

Filed March 21, 2017

Before: Diarmuid F. O'Scannlain, Johnnie B. Rawlinson,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

# SUMMARY[*]

## California Insurance Law

The panel affirmed the district court's judgment in favor of the insured, LMA North America, Inc., and award of attorney's fees, and denied National Union Fire Insurance Company of Pittsburgh, PA's motion for certification of an issue to the California Supreme Court, in LMA's diversity contribution action against its excess insurance carrier, National Union.

In *Diamond Heights Homeowners Ass'n v. Nat'l Am. Ins. Co.*, 227 Cal. App. 3d 563 (1991), a California appellate court held that an excess insurer has three options when presented with a proposed settlement of a covered claim that has met the approval of the insured and the primary insurer: approve the proposed settlement; reject it and take over the defense; or reject it, decline the defense, and face a potential lawsuit by the insured seeking contribution.

Concerning LMA's breach of contract claim, the panel held that the district court correctly followed the *Diamond Heights* rule in this diversity action governed by California law because the case had not been overruled and was not distinguishable. The panel also held that the district court did not commit prejudicial err in defining the standard of proof applicable to LMA's breach of contract claim.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concerning LMA's bad faith claim, the panel held that the district court correctly concluded that the genuine dispute doctrine was subsumed within the standard Judicial Council of California Civil Jury Instructions for breach of good faith and fair dealing, which the district court gave to the jury. The panel concluded that the district court did not err in denying National Union's proposed jury instruction on the genuine dispute doctrine. The panel also rejected National Union's argument that it acted reasonably due to a genuine dispute existing about the application and viability of *Diamond Heights*. The panel held that a jury could reasonably conclude not only that the settlement was reasonable, but also that any dispute about coverage was less than genuine. The panel, therefore, rejected National Union's challenge to the bad faith claim based on the sufficiency of the evidence. The panel held that the district court did not err in awarding attorney's fees that LMA failed to segregate between work done on its recoverable and nonrecoverable claims. The district court concluded that the district court's chosen apportionment of the fees appeared to be fair under California law.

## COUNSEL

Paula M. Carstensen (argued), Jodi S. Green, and Barbara I. Michaelides, Nicolaides Fink Thorpe Michaelides Sullivan LLP, Chicago, Illinois; Paul D. Motz and John W. Patton, Jr., Patton & Ryan LLC, Chicago, Illinois; Christopher R. Wagner and David L. Jones, Gordon & Rees LLP, Los Angeles, California; for Defendant-Appellant.

James Christopher Martin (argued), Melissa A. Meth, and Douglas C. Rawles, Reed Smith LLP, Los Angeles,

California; Thomas W. Ports, Jr., Tillman J. Breckenridge, and Gary S. Thompson, Reed Smith LLP, Washington, D.C.; for Plaintiff-Appellee.

## OPINION

CALLAHAN, Circuit Judge:

In *Diamond Heights Homeowners Association v. National American Insurance Co.*, 227 Cal. App. 3d 563 (1991), a California appellate court ruled that an excess liability insurer has three options when presented with a proposed settlement of a covered claim that has met the approval of the insured and the primary insurer. The excess insurer must (1) approve the proposed settlement, (2) reject it and take over the defense, or (3) reject it, decline to take over the defense, and face a potential lawsuit by the insured seeking contribution toward the settlement. *Id.* at 580–81. Under *Diamond Heights*, the insured is entitled to reimbursement if the excess insurer was given a reasonable opportunity to evaluate the proposed settlement, and the settlement was reasonable and not the product of collusion.

This diversity case presents such a contribution action. The insured, LMA North America, Inc. (LMA),[1] sued its excess insurance carrier, National Union Fire Insurance Company of Pittsburgh, PA (National Union), in connection with National Union's refusal to either contribute $3.75 million toward the settlement of claims brought by a third party or take over the defense. We must decide whether the

---

[1] LMA merged with Teleflex Medical Incorporated, but the parties continue to refer to the business as LMA.

district court erred in applying the *Diamond Heights* rule, instructing the jury, denying National Union's motion for judgment as a matter of law, and awarding fees and costs. We affirm.

## I.

### A. LMA's insurance policies

LMA had two general liability insurance policies covering claims that LMA disparaged other companies: (1) a primary policy issued by Transcontinental Insurance Company (called CNA) with a $1 million limit, and (2) an excess policy issued by National Union with a $14 million limit.

The National Union policy contained a "no voluntary payments" provision stating that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [National Union's] consent."  The policy also contained a "no action" clause stating in relevant part that "[t]here will be no right of action against us under this insurance unless . . . [t]he amount you owe has been determined with our consent or by actual trial and final judgment."  The policy also recognized National Union's right to "participate" in the defense of a claim and, following exhaustion of coverage by the primary insurer, a "duty to defend" the claim.

### B. The underlying Ambu litigation

LMA and its competitor Ambu distribute competing laryngeal mask airway products.  In 2007, LMA brought a

patent infringement suit in federal district court against Ambu related to certain laryngeal masks. Ambu filed trade disparagement and false advertising counterclaims, demanding $28 million. The counterclaims were premised on allegedly false, disparaging statements in LMA's advertising regarding Ambu's products. CNA agreed to defend LMA on the counterclaims. National Union does not dispute that the counterclaims were covered by its insurance policy.

In 2009, the district court granted summary judgment in Ambu's favor on the patent claims and denied LMA summary judgment on the counterclaims. The district court stayed the counterclaims pending resolution of LMA's appeal. In 2010, the Federal Circuit reversed dismissal of the patent claims. *Laryngeal Mask Co. v. Ambu*, 618 F.3d 1367 (Fed. Cir. 2010).

The parties then held a mediation on January 10–11, 2011. National Union did not attend the mediation, but CNA did. LMA's counsel, Stephen Marzen, updated National Union each day. On the second day, LMA and Ambu reached a conditional settlement agreement, under which Ambu would pay LMA $8.75 million for the patent claims while LMA would pay Ambu $4.75 million for the disparagement claims. The settlement was conditioned on LMA's ability to obtain approval and funding from CNA and National Union.

While CNA committed its full $1 million limit, National Union was reluctant to recognize that Ambu's counterclaims could invade its coverage layer. On February 14, 2011, National Union requested an updated analysis of liability and damages from Marzen. Marzen had previously provided National Union with information regarding the counterclaims,

including copies of pleadings and discovery, verbal reports, access to other information, and a January 22, 2010 case report assessing potential liability. The 2010 case report explained that, if the counterclaims went to trial, Ambu could support its damages claim by using internal LMA executive-level emails that suggested knowledge of a false advertising campaign. The report concluded that LMA's possible liability ranged up to $10 million, excluding potential treble damages.

On March 17, 2011, LMA provided the updated analysis requested by National Union. The analysis concluded that, "considering the risk of a damages award substantially in excess of $10 million, and not counting the substantial defense costs to defend against the product disparagement counterclaims through trial, and possible appeal, $4.75 million is a fair and reasonable settlement of Ambu's product disparagement counterclaims." LMA also informed National Union that CNA had approved the settlement and committed its policy limit. LMA requested a prompt reply, explaining that "time is scarce."

On March 23, LMA repeated its request for a response. Two days later, LMA again requested a response and clarified that National Union's options were to (1) accept the settlement, (2) reject the settlement and take over the defense, or (3) reject the settlement and refuse to undertake the defense, leaving LMA the option of pursuing reimbursement in a subsequent action.

On March 25, 2011, National Union sent a list of questions to Marzen about the proposed settlement. Marzen replied four days later, and followed up with a conference call during which he again stated National Union's three options.

National Union promised to respond by April 1, but later committed to "Wednesday [April 6] at the latest."

On April 7, 2011, National Union declined to consent to the proposed settlement without offering to take up the defense. On April 13 and 14, LMA again requested that National Union take up the defense if it chose to reject the settlement. LMA stated that, absent a prompt response, LMA would finalize the settlement.

Having still not heard from National Union regarding taking over the defense, LMA finalized the settlement with Ambu on April 18. LMA promptly notified National Union. On April 21, National Union advised that it would assume the defense of the underlying suit if LMA could "undo" the settlement. LMA promptly responded that the executed settlement could not be undone. LMA further stated that National Union had acted in bad faith in handling the matter, including by waiting until after the settlement to state a willingness to take on the defense, which LMA considered to be an attempt to manufacture a defense that LMA failed to gain National Union's "consent" to the settlement.

## C. The insurance coverage litigation

Following execution of the settlement, LMA sued National Union for breach of contract and bad faith. LMA sought contract damages, interest, attorney's fees and costs, and punitive damages. After discovery, National Union moved for summary judgment, arguing that it had the absolute right to veto the settlement under the policy's "no voluntary payments" and "no action" clauses.

The district court denied National Union's motion for summary judgment. *LMA N. Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 924 F. Supp. 2d 1188, 1208 (S.D. Cal. 2013). The district court ruled that the state appellate court's decision in *Diamond Heights* provided the applicable rule: an "excess insurer may waive its rights under [a no action] clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense." *Id*. at 1202. The district court disagreed with National Union's positions that *Diamond Heights* had been overruled and was factually distinguishable. *Id.* at 1202–04. The court also denied summary judgment on LMA's bad faith claim, ruling that "a reasonable jury could conclude that National Union acted unreasonably in delaying its response to LMA's request that National Union fund the contingent settlement or take over defense of the [c]ounterclaims." *Id.* at 1206.

The case proceeded to trial and the jury unanimously found for LMA on both the breach of contract and bad faith claims, but decided not to award punitive damages. On April 7, 2014, the district court entered judgment in LMA's favor for $6,080,568.43, including $3,750,000 in contract damages; $1,216,580.99 in attorney fees, expert fees and costs; and prejudgment interest of $1,113,987.44. Finally, the court denied National Union's "motion for a new trial and/or judgment to be entered in its favor."

National Union timely appealed and we have jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, National Union argues that the district court erred in (1) applying the *Diamond Heights* rule to this case;

(2) instructing the jury on both the breach of contract and bad faith claims; (3) denying its motion for judgment as a matter of law on the bad faith claim; and (4) awarding $1,216,580.99 in fees and costs.

## A. LMA's breach of contract claim based on *Diamond Heights*

National Union's leading argument requires us to decide whether the district court erred in applying the rule announced by a California appellate court in *Diamond Heights*.

California substantive law governs this diversity insurance coverage action, including the question of whether excess insurers have an absolute right to veto a settlement under a policy's "no action" and "no voluntary payments" clauses. *Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 600 F.3d 1092, 1097 (9th Cir. 2010); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 71–80 (1938). As we have explained:

> When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. However, where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated

to follow the decisions of the state's intermediate appellate courts.

*Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (quoting *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996)). In other words, when, as here, "there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state's intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007).

According to National Union, the district court should not have applied the *Diamond Heights* rule because the California Supreme Court has effectively overruled the decision or, alternatively, would not apply the *Diamond Heights* rule to this case's facts. National Union also argues that the district court improperly instructed the jury on the burden an insured must carry to prevail on a claim based on *Diamond Heights*. We first describe the *Diamond Heights* decision in greater detail and then explain that the district court appropriately followed it.

## 1.  The *Diamond Heights* rule

In *Diamond Heights*, a condominium developer sued its excess insurer, Central, seeking contribution toward the settlement of construction defects claims covered by the excess insurance policy. 227 Cal. App. 3d at 569. The developer and its primary insurer notified Central that the plaintiffs' settlement demand exceeded the primary coverage layer and that it was likely the primary policy limits would be exhausted. The excess insurer sent a reservation of rights

letter and stayed out of the defense.  Though Central offered to contribute a relatively small sum toward settlement, the matter settled on the first day of trial, without Central's contribution and over its objection.  Under a provision of California law that is not at issue here, the trial court reviewed the settlement and found it to be reasonable and not the product of collusion.  *Id.* at 574–75.

The developer then sued Central, seeking contribution toward the settlement.  Central moved for summary judgment on the ground that the settlement was entered without its consent and therefore violated the policy's "no action" clause. The trial court granted summary judgment in Central's favor, but the court of appeal reversed.  *Id.* at 570, 574.  The appellate court ruled that, subject to certain conditions, "a primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage, and . . . enter into such settlement binding upon the excess insurer without the excess insurer's consent, notwithstanding the 'no action' clause."  *Id.* at 580.  Specifically, "the excess insurer may waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense."  *Id*. at 581.

The court explained in detail "[t]he legal basis and policy considerations which support [its] conclusion."  *Id*. at 580.  In terms of legal basis, the court grounded its rule in the duty of good faith owed between insured and insurer, and between insurers:

> Consistent with its good faith duty, the excess insurer does not have the absolute right to veto arbitrarily a reasonable settlement and force the primary insurer to proceed to trial,

> bearing the full costs of defense. A contrary rule would impose the same unnecessary burdens upon the primary insurer and the parties to the action, among others, as does the primary insurer's breach of its good faith duty to settle.

*Id*. at 580–81. The court noted, "In a somewhat analogous situation, when a primary insurer wrongfully denies coverage, unreasonably delays processing a claim, or refuses to defend an action against the insured as required by the policy, the insured is entitled to make a reasonable settlement of the claim in good faith and then sue for reimbursement, even though the policy prohibits settlements without the consent of the insurer." *Id*. at 581 (collecting cases).

The court cited several policy considerations supporting its rule that the excess insurer does not have an absolute right to veto a reasonable settlement. A contrary rule would "imperil[] the public and judicial interests in fair and reasonable settlement of lawsuits." *Id*. (citation omitted). Similarly, a contrary rule would have inequitable consequences for the insured in cases where liability may exceed excess limits, as well for primary insurers in cases where liability does not. Such a rule would effectively allow excess insurers to "get a 'free ride' at the expense of the primary insurer to the detriment of all other parties involved." *Id.* at 582. Finally, the court explained that its rule is not unfair for excess insurers because they are "not without a means of avoiding a proposed settlement or challenging a final settlement." *Id*. An excess insurer "may . . . agree to undertake the defense . . . and either conduct its own settlement negotiations or take the action to trial." *Id*. The excess insurer "may also challenge the settlement on the

ground of unreasonableness or that it is a product of collusion between primary insurer and insured." *Id*.

Applying its rule, the appellate court in *Diamond Heights* reversed the trial court's summary judgment in favor of Central. The court remanded because material factual issues related to the developer's reimbursement claim remained, "including the issue of whether Central was afforded a reasonable opportunity to undertake the defense prior to the settlement." *Id.* at 583.

2. **National Union has not presented convincing evidence that the California Supreme Court would not follow *Diamond Heights*.**

We review the district court's determination of state law de novo. *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991). National Union argues that the district court should not have followed *Diamond Heights* because the case is inconsistent with the California Supreme Court's subsequent decision in *Waller v. Truck Insurance Exchange, Inc.*, 11 Cal. 4th 1 (1995). *Waller* rejected "the automatic waiver rule announced in dictum in *McLaughlin v. Connecticut General Life Ins. Co.*, 565 F. Supp. 434 (N.D. Cal. 1983)." *Waller*, 11 Cal. 4th at 32, 33. "[T]he *McLaughlin* . . . court held that an insurance company which relies on specified grounds for denying a claim thereby waives the right to rely in a subsequent litigation on any other grounds which a reasonable investigation would have uncovered." *Id*. at 32. In rejecting this waiver rule, the California Supreme Court explained:

> Case law is clear that waiver is the intentional relinquishment of a known right after

> knowledge of the facts.  The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver.  The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.

*Id.* at 31 (alteration and citations omitted).

National Union asserts that *Waller*'s rule that an insurer waives a policy defense only upon an intentional relinquishment of a known right is irreconcilable with the *Diamond Heights* rule, which does not require the intentional relinquishment of an excess insurer's rights under a "no action" clause.  We disagree for several reasons.

First, as the district court noted, *Waller* did not mention *Diamond Heights* and only "reiterated waiver principles that existed before *Diamond Heights*."  *LMA*, 924 F. Supp. 2d at 1203.

Second, California appellate courts have relied on *Diamond Heights* after *Waller*.  *Risely v. Interinsurance Exch. of Auto. Club*, 183 Cal. App. 4th 196, 210, 217 (2010); *Executive Risk Indem., Inc. v. Jones*, 171 Cal. App. 4th 319, 332 (2009); *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 987 (2006), *as modified on denial of reh'g* (Feb. 17, 2006).

*Fuller-Austin* and *Risely* represent two post-*Waller* endorsements of the *Diamond Heights* rule by two other

districts of the California Court of Appeal. *Fuller-Austin* provides the strongest endorsement. In that case, the appellate court concluded that an approved bankruptcy plan resolving third-party claims is a settlement that was binding on excess insurers, even though the insurers did not consent to the settlement as required by the insurance policy. *Fuller-Austin*, 135 Cal. App. 4th at 969, 982–91. However, in opposing a contribution action by the insured, the excess insurers may "challenge the Plan for fairness, reasonableness and lack of fraud or collusion." *Id.* at 990. In so holding, the court agreed with "[t]he rationale of *Diamond Heights*":

> It would impose an unnecessary burden on primary insurers and parties to an underlying action to hold that an excess insurer has an absolute right to withhold its consent to a settlement, while at the same time decline to participate in the action. . . . Allowing [the insured] to enter into a global settlement in the bankruptcy court without [the excess insurers'] participation, while permitting [the excess insurers] to challenge the Plan for fairness, reasonableness and lack of fraud or collusion in the instant action, does no violence to the policy language requiring [the excess insurers'] consent. (*Diamond Heights*, Cal. App. 3d at 581.) We do not believe that the policies can be read to permit an excess insurer to hover in the background of critical settlement negotiations and thereafter resist all responsibility on the basis of lack of consent.

*Id.* at 987.

*Risely* involved a dispute against a primary insurer, but the *Risely* court also quoted *Diamond Heights* in holding that an "insurer is deemed to have waived its rights under the 'no action' clause by such conduct constituting a breach of its obligations under the policy." *Risely*, 183 Cal. App. 4th at 201, 210.

We note that *Diamond Heights* has been criticized by other courts. *See, e.g.*, *Hartford Accident & Indem. Co. v. Superior Court*, 29 Cal. App. 4th 435, 440 n.4 (1994); *Pac. Estates, Inc. v. Superior Court*, 13 Cal. App. 4th 1561, 1567–76 (1993). But as the *Fuller-Austin* court explained, "this criticism revolves around its further conclusion that Central was bound by the good faith settlement determination as a 'co-obligor.'" 135 Cal. App. 4th at 987 n.11. "Subsequent cases have clarified that an excess insurer is not conclusively bound by a good faith settlement determination in [underlying litigation in] which it did not participate." *Id*. This part of *Diamond Heights* has no bearing here because there is no argument that the settlement between LMA and Ambu had preclusive effect on National Union in this action for reimbursement.

Third, *Diamond Heights* and *Waller* are reconcilable. *Waller* stands for the proposition that a insurer does not waive a right under an insurance policy simply by failing to mention it in a claim letter. 11 Cal. 4th at 33. By contrast, *Diamond Heights* is about how an insurance policy should be read in order to reconcile an excess insurer's contractual rights under "no action" and "no voluntary payments" clauses with the insured's rights under the implied covenant of good faith and fair dealing. In other words, notwithstanding the court's use of the word "waiver" in *Diamond Heights*, the rule is not so much about the waiver of an insurer's contractual right than

it is about an insurer's breach of a contractual obligation. Whereas *Waller* prevents a policy from being expanded beyond the contracting parties' intent, the covenant of good faith underlying *Diamond Heights* is grounded on "honoring the reasonable expectations created by the autonomous expressions of the contracting parties." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984) (Scalia, J.).

The wisdom of the *Diamond Heights* rule may not be beyond reasonable debate. But for the implied covenant of good faith and fair dealing, the rule would be contrary to the language of the "no action" and "no voluntary payments" provisions. The rule thus arguably gives the insured and primary insurers more than was bargained for, at least if excess insurers have not raised their rates to accommodate for additional costs imposed by the rule. National Union notes that primary insurers charge a premium for the duty to defend, while excess insurers do not, as they generally may rely on defense funded by primary insurers.

However, as noted, the rule is fairly supported by other insurance principles and policy considerations. Indeed, the underlying notion that "no action" and "no voluntary payment" clauses do not create absolute rights to veto settlements is long established. Many courts have held that "when a primary insurer wrongfully denies coverage, unreasonably delays processing a claim, or refuses to defend an action against the insured as required by the policy, the insured is entitled to make a reasonable settlement of the claim in good faith and then sue for reimbursement, even though the policy prohibits settlements without the consent of the insurer." *Diamond Heights*, 227 Cal. App. 3d at 581 (collecting cases).

We hold that National Union has failed to show that the district court erred in "follow[ing] the state's intermediate appellate court decision," because National Union has not proffered "convincing evidence that the state's supreme court likely would not follow it." *See Ryman*, 505 F.3d at 994.**[2]**

### 3. *Diamond Heights* is not distinguishable on its facts.

National Union also argues that the district court wrongly extended *Diamond Heights* in applying it to this case's different facts. National Union distinguishes this case from *Diamond Heights* because "[1] CNA's $1 million limit was not exhausted; [2] CNA never withdrew its defense; [3] LMA's liability for the Ambu disparagement claim was uncertain; [4] discovery was not complete; [5] there was no pending trial date; and [6] [there was] no exposure to LMA beyond the $15 million in available insurance coverage." None of these facts materially distinguishes this case from *Diamond Heights*.

First, CNA committed its policy limit over a month before settlement, which is earlier than the primary insurer in *Diamond Heights*. Second, in both cases, the primary insurer funded the defense up until settlement, and the excess insurer did not take over the defense. Regardless of who funds counsel, the insured and the primary insurer owe a duty of good faith that runs not only to each other but also to the excess insurer. *See Diamond Heights*, 227 Cal. App. 3d at

---

**[2]** National Union's motion to certify the question of the *Diamond Heights* rule's validity to the California Supreme Court is denied. In light of consistent California appellate court decisions addressing the duties of excess carriers with respect to the settlement of covered claims against the insured, we find that certification is not warranted.

578–79.  Third, the insured's liability was not certain in either case.  The parties in both cases settled before judgment and the settlements were found to be reasonable assessments of potential liability.  Fourth, the fact that discovery had not been completed in this case may be relevant to the reasonableness of settlement but does not render the rule inapplicable.  Here, the jury found the settlement to be reasonable.  Indeed, there may be good reasons to settle mid-discovery, such as the risk of disclosing damaging documents, rather than on the eve of trial.  Fifth, the fact that no trial date was set might bear on the settlement's reasonableness and whether the insurer had sufficient time to consider the settlement, but does not distinguish *Diamond Heights*.  The jury decided both of these issues in LMA's favor.   In fact, National Union's foot-dragging may reasonably be seen as more egregious than the excess insurer's conduct in *Diamond Heights*.  The excess insurer in *Diamond Heights* had less than two weeks to consider the settlement, whereas National Union had months.  Finally, in both cases, potential liability was not projected to exceed excess policy limits.  *See id.* at 575, 582.

National Union also contends more generally that *Diamond Heights* should not be applied because "LMA's self-interest was the driving force behind the settlement." The structure of the settlement may suggest that LMA did not have a strong incentive to achieve the lowest settlement of the disparagement claims.  Arguably, LMA had an incentive to fork over its insurers' money in satisfaction of the disparagement counterclaims in order to secure a larger payout on the patent claims.  However, a jury found that the settlement was reasonable and not a product of collusion. Substantial evidence supports the jury's unanimous findings, which National Union appears to concede.

In sum, *Diamond Heights* has not been overruled and is not distinguishable.  The district court correctly followed the *Diamond Heights* rule in this diversity action governed by California law.

### 4.  The district court did not commit prejudicial error in defining the standard of proof applicable to LMA's breach of contract claim.

Again relying on *Waller*, National Union argues that the district court applied the wrong standard of proof to LMA's claim based on *Diamond Heights*.  National Union contends that, under *Waller*, LMA should have been required to prove its contract claim by clear and convincing evidence rather than by a preponderance of the evidence.  We review the district court's jury instructions for an abuse of discretion, but we consider "*de novo* whether the challenged instruction correctly states the law."  *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014).

National Union's argument fails because California courts have not required a burden of proof more demanding than the preponderance of the evidence standard that LMA met.  In analogous cases, California courts have held that an insured bears a prima facie burden of showing: "(1) the insurer wrongfully failed or refused to provide coverage or a defense, (2) the insured thereafter entered into a settlement of the litigation which was (3) reasonable in the sense that it reflected an informed and good faith effort by the insured to resolve the claim."  *Pruyn v. Agric. Ins. Co.*, 36 Cal. App. 4th 500, 528 (1995).  After the insured so shows, "the burden of proof will shift to the defendant insurers to persuade the trier of fact, by a preponderance of the evidence, that [the insured's] settlement did not represent a reasonable resolution

of plaintiff's claim or that the settlement was the product of fraud or collusion." *Id*. at 530. *Pruyn*'s burden-shifting framework persists after *Waller*. *See, e.g.*, *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502–03 (9th Cir. 1997); *Safeco Ins. Co. v. Superior Court*, 71 Cal. App. 4th 782, 790 n.5 (1999).

Applying this burden-shifting rule to claims under the *Diamond Heights* rule would mean that the insured's prima facie burden includes, in addition to the elements listed above, showing that the insurer was "afforded a reasonable opportunity of undertaking the defense in order to avoid settlement." *Diamond Heights*, 227 Cal. App. 3d at 580. Once a prima facie showing is made, the burden of proof on this element would then shift to the excess insurer to show, by a preponderance of the evidence, that it was not provided with a reasonable opportunity to evaluate the settlement and decide whether to undertake the defense.

National Union's argument that LMA should have been held to a clear and convincing evidence standard fails in light of California cases applying a less demanding, burden-shifting framework to analogous claims. While the district court did not employ the burden-shifting framework and instead required LMA to prove its claim by a preponderance of the evidence, any error in defining the burden of proof benefitted National Union and therefore was harmless. *See, e.g.*, *Mockler v. Multnomah Cty.*, 140 F.3d 808, 812 (9th Cir. 1998).

## B.  LMA's bad faith claim

National Union challenges the judgment on the bad faith claim on two related grounds. National Union first argues

that the judgment should be vacated because the district court did not instruct the jury on the genuine dispute doctrine. National Union contends that, under this doctrine, it did not act in bad faith because "a genuine dispute as to its coverage liability exist[ed]" due to uncertainty regarding "the applicability and viability of *Diamond Heights.*"

Even assuming that the genuine dispute doctrine applies to this case, National Union's argument fails.[3] The district court correctly concluded that the doctrine is subsumed within the standard Judicial Council of California Civil Jury Instructions (CACI) for breach of good faith and fair dealing, which the district court gave to the jury.[4] *See Judicial*

---

[3] The genuine dispute doctrine has been applied in related contexts. *See Lunsford v. Am. Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994); *Opsal v. United Servs. Auto. Ass'n*, 2 Cal. App. 4th 1197, 1205–06 (1991). However, our court and several California appellate courts have expressed skepticism about its applicability to "third party claim" cases like this one. *Mt. Hawley Ins. Co. v. Lopez*, 215 Cal. App. 4th 1385, 1424 (2013) ("It is doubtful that the so-called 'genuine dispute doctrine' applies in third party duty to defend cases like this one."); *Howard v. Am. Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498, 530 (2010) ("[I]t has never been held that an insurer in a third party case may rely on a genuine dispute over coverage to refuse settlement."); *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 758 (9th Cir. 2012) (finding the question of "whether the genuine dispute doctrine applies to the duty to settle third party claims" uncertain). *Cf. CalFarm Ins. Co. v. Krusiewicz*, 131 Cal. App. 4th 273, 286–87 (2005) (applying the genuine dispute doctrine in the context of the duty to indemnify, but explaining that "[w]hen the issue of the insurer's objective reasonableness depends on an analysis of legal precedent, reasonableness is a legal issue reviewed de novo").

[4] Under CACI 2331, the standard jury instruction for determining "breach of good faith and fair dealing" requires five elements: "(1) the insured suffers loss covered under an insurance policy; (2) the insurer was notified of the loss; (3) the insurer unreasonably fails or delays payment

*Council of California Civil Jury Instructions* No. 2331, Direction for Use (2016). Indeed, a California appellate court has affirmed a trial court's refusal to give special instructions on the genuine dispute doctrine beyond CACI 2331. *McCoy v. Progressive W. Ins. Co.*, 171 Cal. App. 4th 785, 794 (2009). The court agreed with the trial court that "the genuine dispute doctrine was subsumed within the concept of what is reasonable and unreasonable as set forth in CACI 2331." *Id.* at 792. In other words, if a genuine dispute "as to the insurer's liability under the policy" exists, the insurer did not withhold its payment unreasonably, which is "[t]he linchpin of a bad faith claim." *Id.* at 793. Accordingly, the district court did not err in denying National Union's proposed instruction on the genuine dispute doctrine.

National Union also argues that, as a matter of law, it acted reasonably because a genuine dispute existed about the application and viability of *Diamond Heights*.[5] National Union presented this argument to the jury, contending that it was reasonable to refuse the settlement and tell LMA's counsel to "fight on" without agreeing to assume the defense. The jury unanimously disagreed, and their verdict is

---

of the policy benefit; (4) the insured is harmed; and (5) the insurer's failure or delay is a substantial factor in causing the insured's harm."

[5] We review the district court's decision denying judgment as a matter of law *de novo*. *First Nat'l Mort. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011). "If sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). "A jury's verdict must be upheld if supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.*

supported by substantial evidence. LMA's counsel repeatedly advised National Union that, under *Diamond Heights*, National Union's options were to accept the settlement, or reject it and take over the defense. National Union did neither, and continued to drag out any final response with respect to its obligations. In fact, National Union waited until two days after the settlement, when it knew that the case had already been settled, to state any willingness to take on the defense.

The jury could rationally conclude based on these facts that National Union acted unreasonably by refusing to take over the defense or approve the reasonable settlement, knowing full well of its obligations under California law. In other words, a jury could reasonably conclude not only that the settlement was reasonable, but also that any dispute about coverage was less than genuine. This determination is controlling "even if it is also possible to draw a contrary conclusion." *Harper*, 533 F.3d at 1021. We therefore reject National Union's challenge to the bad faith claim based on the sufficiency of the evidence.

## C.  The district court's award of fees and costs

Where an insurer has breached the implied covenant of good faith and fair dealing by unreasonably refusing to settle a claim, California law entitles the insured to fees related to "obtain[ing] the benefits due under a policy." *Brandt v. Super. Ct.*, 37 Cal. 3d 813, 817 (1985). *Brandt*, however, does not entitle the insured to recover "[f]ees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy." *Id.* at 819.

The parties agree that *Brandt* entitles LMA to fees attributable to its breach of contract claim but not to fees attributable solely to its bad faith claim and related punitive damages claim. However, National Union contends that the district court erred in awarding attorney's fees that LMA failed to segregate between work done on its recoverable and non-recoverable claims. We review the district court's attorney's fees award for abuse of discretion. *Childress v. Darby Lumber*, Inc., 357 F.3d 1000, 1011 (9th Cir. 2004).

National Union's argument that the district court was required to deny all unsegregated fees is plainly contrary to California law providing for "apportionment of *Brandt* fees." *Cassim v. Allstate Ins. Co.*, 33 Cal. 4th 780, 813 (2004). National Union's alternative argument that the fee award should be vacated and remanded for a new hearing with instructions that the fees "be split evenly" also fails. Even assuming that the district court was required to apportion the fees between the contract and bad faith claims notwithstanding those claims' intertwinement, *see Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129–30 (1979), National Union has not shown that the district court abused its discretion. The district court apportioned 10% of the unsegregated fees to the bad faith claim, explaining that this apportionment was "reasonable . . . and supported by the evidence and the history of the litigation." We are not left with a definite and firm conviction that the district court committed a clear error of judgment; rather, the chosen apportionment appears to be fair. As National Union noted in its reply brief, "[t]he applicability and viability of *Diamond Heights* was, and continues to be, the focal point of the parties' dispute."

## III.

We affirm the district court's judgment in favor of LMA and its award of attorney's fees.  We deny National Union's motion for certification.  The costs of this appeal are taxed against National Union.

**AFFIRMED.**